[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1566 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1567 
OPINION
Dewayne M., the noncustodial father of John M., appeals the juvenile dependency court's dispositional order denying his request to place John with him in Tennessee. Dewayne's contentions fall into two categories: a challenge to the court's finding that such placement would be detrimental to John (Welf. Inst. Code, § 361.2) and a challenge to rulings concerning the Interstate Compact on the Placement of Children (ICPC) (Fam. Code, § 7900 et seq.). We conclude the court erred by finding that John's placement with Dewayne would be detrimental within the meaning of Welfare and Institutions Code section 361.2, abused its discretion by denying Dewayne's request for a continuance of the dispositional hearing pending completion of a home evaluation through the ICPC process or some other means, and erred by concluding that an ICPC report was required before placing John with Dewayne.
 I. BACKGROUND A. Detention and Jurisdiction
In September 2005, when John was 13 and one-half years old, the San Diego County Health and Human Services Agency (the Agency) filed a dependency petition alleging his mother, E.E., physically abused him. The petition did not mention Dewayne, instead listing John's stepfather as an alleged father. At the detention hearing, the court struck the stepfather's name from the petition and added Dewayne's name. John was detained in Polinsky Children's Center for about one week, then moved to the home of his maternal grandmother, where his 10-month-old half sister, S.E., was also detained. *Page 1568 
E.E. reported that Dewayne was John's father, was subject to a 1996 child support order and had provided "medical insurance for a while" but had "never paid any child support." Dewayne told the social worker that he had been in contact with John for one year after a four-year hiatus, and the earlier lack of contact "was not on [his] part." According to Dewayne, in 1999 John had a broken leg and would not say how it happened, while E.E. claimed that John had fallen. Dewayne also said that E.E. "gets in pure rage" and John had told him that she shook S.E. Just three weeks after the dependency petition was filed, the social worker obtained a criminal clearance for Dewayne showing that he had no criminal record. The social worker concluded that placement with Dewayne was "a viable option" but an ICPC report "would have to be completed before [Dewayne's] home [could] be considered."
On October 13, 2005, Dewayne's counsel asked that John be placed with Dewayne, asserting that he was a nonoffending, noncustodial parent, and placement would not be detrimental. Counsel also requested expedited ICPC proceedings. The court granted the latter request and gave the Agency discretion to detain John with an approved relative with notice to John's counsel.
On October 14, 2005, John was detained with his aunt, with whom he wished to live. On the same date, S.E. was detained with her parents (E.E. and John's stepfather). On October 31, John told the social worker that he did not want to live with Dewayne because Dewayne lived in the country. On November 3, the social worker reported, "The Agency has not submitted ICPC and it appears that one will not be needed, as [John] does not desire to live with [Dewayne]." On November 17, the juvenile court entered a true finding on the petition and granted Dewayne supervised visitation.
 B. Disposition
At the November 18, 2005 dispositional hearing, the court amended the petition to state that Dewayne had been adjudicated John's father by a Tennessee court. Dewayne's counsel requested a continuance pending completion of an ICPC report, and repeated his request for John's placement with Dewayne as a nonoffending, noncustodial father. The court said that it would not place John with Dewayne and close the case, so an ICPC report was required. It noted that there had been little contact between Dewayne and John, John did not want to move, there was a reunification plan for E.E., and Dewayne was out of state, making him, "to some degree, . . . an unknown entity"; and services would be necessary to ensure John's safety and the *Page 1569 
success of a placement with Dewayne. It further stated that its order for ICPC proceedings could not be implemented before the jurisdictional findings; due to John's age, those proceedings could not be expedited; it would take approximately a month or six weeks to receive the ICPC report and John could be in another placement without foreclosing the possibility of future placement with Dewayne. The court denied the continuance request and ordered that the ICPC report be prepared and submitted as soon as possible.
After the court received the Agency's reports into evidence, Dewayne's counsel moved for a directed verdict, arguing that the Agency had not met its burden of showing detriment by clear and convincing evidence. Alternatively, counsel requested a continuance for an ICPC report or a home evaluation by some other method. The court denied the motion. After listening to the social worker's testimony, it incorporated its earlier remarks and stated that John had serious problems that could be addressed in San Diego, where he had a sibling relationship and an extended family, and he did not have an ongoing relationship with Dewayne. It therefore found detriment and ordered John placed with relatives.
 II. DETRIMENT
Welfare and Institutions Code section 361.2, subdivision (a) states: "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." Welfare and Institutions Code section 361.2, subdivision (a) evidences "the Legislative preference for placement with [the nonoffending noncustodial] parent." (Inre Austin P. (2004) 118 Cal.App.4th 1124, 1132
[13 Cal.Rptr.3d 616].)
The juvenile court must make the detriment finding by clear and convincing evidence. (In re Luke M. (2003)107 Cal.App.4th 1412, 1426 [132 Cal.Rptr.2d 907]; In re IsayahC. (2004) 118 Cal.App.4th 684, 700 [13 Cal.Rptr.3d 198].) "We review the record in the light most favorable to the court's order to determine whether there is substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that the children would suffer such detriment. [Citations.] Clear and convincing *Page 1570 
evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt. [Citation.]" (Inre Luke M., supra, 107 Cal.App.4th at p. 1426.)
Here, the court based its detriment finding on John's wishes, his need for services, his relationship with S.E. and members of his extended family in San Diego, his lack of a relationship with Dewayne, the paucity of information about Dewayne, and E.E.'s reunification plan. These factors do not support the finding.
At the inception of this case, John was 13 and one-half years old and S.E. was 10 months old. They were detained together for only 16 days before he was moved to his aunt's home. (Cf.In re Isayah C, supra, 118 Cal.App.4th at p. 700.) The only evidence concerning the sibling relationship was that early in the case the social worker reported that John refused to talk to her because she would not let him hold S.E. and also that the social worker testified that John had asked to see S.E. and Dewayne had "stated . . . his concern that [John] wants to stay wherever [S.E.] is." The social worker also testified that Dewayne was willing to facilitate sibling visitation and she did not know whether sibling visitation had occurred. These facts provide no support for "a finding that there was a high probability that moving to [Tennessee] would have a devastating emotional impact on [John]." (In re LukeM., supra, 107 Cal.App.4th at p. 1426.) Nor is there any support for the proposition that a move away from his extended family in San Diego would be detrimental to John (cf.ibid.) or that a move would prevent E.E. from reunifying.
By the time of the dispositional hearing, John was nearly 14 years old. While, at that age, he was entitled to have his wishes considered, he was not entitled to decide where he would be placed. (In re Luke M., supra,107 Cal.App.4th at p. 1426.) Furthermore, his wishes were unclear. Both the social worker and John's counsel said that he wanted to live with his aunt. The social worker reported that John told her that he did not want to live with Dewayne because Dewayne lived in the country. At the dispositional hearing, she testified that she did not ask John what he meant by this statement, she could not see his facial expression during the conversation, and John's aunt was in the room while they spoke. The social worker also testified that John had not asked for visitation with Dewayne and had never told her that he did not want to live with Dewayne.
It is evident from the record that John is a troubled young man in need of services. In addition to being physically abused, he had cognitive difficulties and did not trust adults. He had been oppositional and aggressive from early *Page 1571 
childhood and had been hospitalized for uncontrollable aggression. He suffered from serious emotional disturbance and attention deficit hyperactivity disorder but did not consistently take the medication prescribed for the latter condition. By early November 2005, he was in counseling, and psychiatric and psychological evaluations and a medication assessment were to be scheduled.
At the dispositional hearing, the social worker admitted that she had no information that Dewayne was unable to meet John's special needs. While Dewayne acknowledged that he had been out of contact with John for four years, the reasons for this are not entirely clear; in addition, the court found Dewayne was not to blame, and contact resumed about a year before the dependency petition was filed. Thus, John's need for services, his lack of a relationship with Dewayne, and the paucity of information about Dewayne do not support the detriment finding.
We conclude that the Agency did not meet its burden of proving detriment by clear and convincing evidence, and the juvenile court erred by finding that John's placement with Dewayne would be detrimental within the meaning of Welfare and Institutions Code section 361.2.
 III. DEWAYNE'S CONTINUANCE REQUEST
Dewayne contends that the court abused its discretion by denying his request to continue the dispositional hearing to permit completion of a home evaluation through the ICPC process or some other method.
The Agency now argues that Dewayne lacked standing to request a continuance because he was still an alleged father when he made the request. The Agency did not raise this argument at the dispositional hearing and did not oppose the continuance request. Furthermore, immediately after Dewayne's counsel first mentioned a continuance, the court stated, "I think there is a sufficient basis to find that [Dewayne] is adjudicated. I will amend the petition to state that he is adjudicated by virtue of the Tennessee court order." After this, Dewayne's counsel renewed his continuance request.
Moreover, at an earlier hearing, Dewayne's counsel asserted that Dewayne was "at the very least . . . an adjudicated father" and asked that the social worker investigate. The Agency did not object. The court replied, "So I'll renew the request for the social worker to obtain further information regarding [Dewayne]'s child support status so that we can determine if he has been adjudicated as the father." The Agency's next report, filed on the date of the dispositional hearing, did not mention this matter. *Page 1572 
We understand why the court was reluctant to place John with Dewayne when very little was known about Dewayne other than his lack of a criminal record. What the court should have done was continue the hearing, leaving John in his temporary placement for the period of time necessary to gather information about Dewayne. In light of John's age, his special needs, and the court's estimate that it would take about a month or six weeks to receive an ICPC report, good cause existed for a continuance. A continuance would not have been contrary to John's interests. (Welf. Inst. Code, § 352, subd. (a).) While it would have delayed the completion of the dispositional hearing to more than 60 days beyond the detention hearing (Welf. Inst. Code, § 352, subd. (b)), the exceptional circumstances in this case justified such a delay. The court abused its discretion by denying Dewayne's continuance request.
 IV. INVESTIGATION AND MONITORING OF AN OUT-OF-STATE PLACEMENT WITH A PARENT
The juvenile court should also have ordered the Agency to obtain information about Dewayne. While, as discussed below, ICPC compliance is not required for an out-of-state placement with a parent, nothing in the ICPC prevents the use of an ICPC evaluation as a means of gathering information before placing a child with such a parent. In that situation, however, a favorable recommendation by the agency in the receiving state is not a prerequisite to placement if the evaluation and other evidence show that the placement would not be detrimental.
The ICPC also permits a sending public agency to enter into a voluntary agreement with "an authorized public or private agency in the receiving state" for the performance of services related to the case by the agency in the receiving state. (Fam. Code, § 7901, art. 5, subd. (b); see also In re JohnnyS. (1995) 40 Cal.App.4th 969, 979 [47 Cal.Rptr.2d 94].) In some situations, the Agency may be able to monitor the situation from California. (In re Johnny S., supra, at p. 979.) "[S]tates differ as to whether they will . . . provid[e] courtesy supervision services. . . . Th[is] point[s] out the need for early and ongoing communication with the social services agency in the receiving state as to what they will and will not do in a given case. All parties should ensure that such communication is taking place and that [the] necessary information is received before important decisions impacting on the child's welfare are made." (Seiser 
Kumli, Cal. Juvenile Courts, Practice and Procedure (2006) Disposition Hearing, § 2.128 [2], p. 2-251.)
Here, neither the Agency nor the court explored alternative means of investigating Dewayne's home and providing services in Tennessee. Despite the court's statement early in this case that Dewayne's home was to be *Page 1573 
evaluated, the Agency unilaterally decided that this was unnecessary, reasoning that John did not want to live with Dewayne. A child's preference, however, is clearly not the deciding factor in a placement decision, even when that child is nearly 14 years old. Likewise, the Agency is not entitled to deprive the court of the information needed to make a placement decision.
Because Dewayne is a parent, the appropriate investigation is a basic one, less rigorous than the investigation necessary for placement with a more distant relative such as a cousin. While Dewayne's geographical distance from San Diego necessitates a greater effort to garner information, it should not subject him to greater scrutiny. The depth of investigation should be determined by the fact that he is John's parent, not that he lives in Tennessee.
 V. APPLICABILITY OF THE ICPC TO PLACEMENT WITH AN OUT-OF-STATE PARENT
The ICPC is to be "liberally construed to effectuate [its] purposes." (Fam. Code, § 7901, art. 10.) Those purposes are, in essence, "to facilitate the cooperation between states in the placement and monitoring of dependent children." (Tarn S. v. Superior Court (1993) 13 Cal.App.4th 1834,1837 [17 Cal.Rptr.2d 315].) Placement with an out-of-state parent need not follow ICPC procedure, as is plain from the statutory language.
The ICPC governs conditions for out-of-state "placement in foster care or as a preliminary to a possible adoption." (Fam. Code, § 7901, art. 3, subds. (a), (b).) It defines "placement" as "the arrangement for the care of a child in a family free or boarding home or in a child-caring agency or institution but does not include any institution caring for the mentally ill, mentally defective or epileptic or any institution primarily educational in character, and any hospital or other medical facility." (Fam. Code, § 7901, art. 2, subd. (d).)
In Tara S. v. Superior Court, supra,13 Cal.App.4th 1834, this court held that interpreting the definition of "placement" in Family Code section 7901, article 2, subdivision (d) as including a parent's home "does not make sense in light of article 3 which limits the ICPC to foster care and possible adoption." (Tara S. v. Superior Court, supra, at pp. 1837-1838, citing McComb v. Wambaugh (3d Cir. 1991)934 F.2d 474, 480.) In In re Johnny S. the reviewing court agreed with Tara S. v. Superior Court, supra,13 Cal.App.4th 1834, concluding "that compliance with the ICPC is not mandatory when a California court places a child with a parent residing in another state." (In re Johnny S.,supra, 40 Cal.App.4th at p. 971.) *Page 1574 
The In re Johnny S. court observed that the advance notice and approval conditions of Family Code section 7901, article 3, subdivisions (b) and (d) "clearly do not apply when the child is placed with a parent." (In re Johnny S.,supra, 40 Cal.App.4th at p. 977.) Those subdivisions require that "the sending agency shall furnish the appropriate public authorities in the receiving state written notice of the intention to send, bring, or place the child in the receiving state" (Fam. Code, § 7901, art. 3, subd. (b)) and that before sending the child, the sending agency obtain written notification from "the appropriate public authorities in the receiving state . . . that the proposed placement does not appear to be contrary to the interests of the child." (Fam. Code, § 7901, art. 3, subd. (d).)
A similar conclusion can be drawn from the statutory provision concerning retention of jurisdiction and financial responsibility. Family Code section 7901, article 5, subdivision (a) states, "The sending agency shall retain jurisdiction over the child sufficient to determine all matters in relation to the custody, supervision, care, treatment, and disposition of the child which it would have had if the child had remained in the sending agency's state, until the child is adopted, reaches majority, becomes self-supporting, or is discharged with the concurrence of the appropriate authority in the receiving state. That jurisdiction shall also include the power to effect or cause the return of the child or its transfer to another location and custody pursuant to law. The sending agency shall continue to have financial responsibility for support and maintenance of the child during the period of the placement. . . ." The court in In re Johnny S.,supra, 40 Cal.App.4th at page 977, noted that while this subdivision "does not state a specific limitation to foster care and preadoptive placements," its provisions regarding the sending agency's retention of jurisdiction and continued financial responsibility, "like the provisions of article 3, are part of the ICPC's overall design to protect children in placements that are substitutes for parental care. In the case of a parent, who has a duty to support the child, [the] provision [for] the sending state['s continued financial responsibility] is unnecessary." (In re Johnny S.,supra, at p. 977.)
The In re Johnny S. court also discussed regulations promulgated by the California Health and Welfare Agency. Those regulations stated that the ICPC applied to placement in a "`[r]elative's home, including the home of a parent'" and that before California sent a child out of state, it must have received written approval of its ICPC request and a home study. (In re Johnny S., supra, 40 Cal.App.4th at p. 978.) The court said: "These regulations were promulgated by an executive agency pursuant to its rulemaking authority. To the extent that regulations conflict with statutes or decisional law, the law controls the regulations. [Citation.] The ICPC article 3 requirement *Page 1575 
of advance approval from the receiving state for a placement is clearly limited to cases of placement `in foster care or as a preliminary to a possible adoption. . . .' (Fam. Code, §7901, art. 3, subd. (b).) Regulations requiring such advance approval for placement with a parent are neither binding nor persuasive in light of the limitations expressed in the statute itself." (In re Johnny S., supra,40 Cal.App.4th at p. 978.)
For the reasons stated in Tara S. v. Superior Court,supra, 13 Cal.App.4th 1834, and In re Johnny S.,supra, 40 Cal.App.4th 969, we conclude that compliance with the ICPC is not required for placement with an out-of-state parent. The Judicial Council's subsequent adoption of California Rules of Court, rule 1428 (rule references are to the California Rules of Court) does not alter that conclusion. That rule, adopted in 1999, purports to implement "the purposes and provisions of the [ICPC]." (Rule 1428(a).) Rule 1428 includes in its definition of "placement" (1) an award of custody to an out-of-state parent where "the sending court retains dependency jurisdiction over the child or . . . requests or provides for supervision or other services or places some other condition or restriction on the conduct of the parent" (rule 1428(b)(1)) and (2) an order sending a child out of state without a specific return date, with a return date more than 30 days later, or with a return date after the end of a school vacation, unless "jurisdiction has been terminated or . . . dependency is maintained only to provide services to, or [impose conditions on] the noncustodial parent remaining in the sending jurisdiction." (Ibid.) Rule 1428(g) states, "If a child is placed in another jurisdiction under the terms of the [ICPC], the sending court shall not terminate its jurisdiction until the child is adopted, reaches majority, or is emancipated, or the dependency is terminated with the concurrence of the receiving state authority."
The Judicial Council is empowered to "adopt rules for court administration, practice and procedure." (Cal. Const., art. VI, § 6, subd. (d).) "[R]ules of court are supposed to assist in interpreting and implementing the legislative scheme for dependent minors. In cases of conflict or ambiguity the statutory language, and Supreme Court decisions interpreting those statutes, must control over the rules." (In reMichael D. (1996) 51 Cal.App.4th 1074, 1084
[59 Cal.Rptr.2d 575]; accord, In re Johnny S., supra,40 Cal.App.4th at p. 979.) (5) Rule 1428 attempts to expand the application of the ICPC to placements with out-of-state parents. It thus conflicts with the statutory language, which controls over the rule. Thus, to the extent that rule 1428 requires ICPC compliance in the case of an out-of-state placement with a parent, it is ineffective. Any regulation with a like requirement is also ineffective. (In re Johnny S.,supra, 40 Cal.App.4th at p. 978.)
The juvenile court erred by concluding that an ICPC report was required before placing John with Dewayne. *Page 1576 
In its petition for rehearing, the Agency has set forth numerous situations well beyond the facts and holding of this case. We decline to consider matters that are not before us.
 DISPOSITION
The dispositional judgment is reversed. The matter is remanded to the juvenile court for a new dispositional hearing. At the hearing, the court may order the Agency to obtain information about the suitability of Dewayne's home as a placement for John, either through the ICPC process or by alternative means. The court shall make its placement decision after receiving any information it deems necessary, and after evaluating the criteria in Welfare and Institutions Code section 361.2, in a manner consistent with this opinion.
McConnell, P. J., and Haller, J., concurred.
A petition for a rehearing was denied September 15, 2006, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied December 13, 2006, S146873. *Page 1577