Filed 4/16/13  In re Christiana M. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re CHRISTIANA M. et al., Persons Coming Under the Juvenile Court Law. | B243044 (Los Angeles County Super. Ct. No. CK89428) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. CHRISTINA M., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County. Robert L. Stevenson, Juvenile Court Referee.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, Kim Nemoy, Deputy County Counsel, for Plaintiff and Respondent.

_____

Christina M. appeals from jurisdictional and dispositional orders in the dependency proceedings concerning her daughters Christiana and P. We affirm.

Facts

This family came to the attention of DCFS on July 21, 2011, when the child abuse hotline received a report that P. had gotten a bump on her head when she fell out of her stroller. Christiana was five years old, and P. was two.

Mother and the children were living at the Union Rescue Mission, and had been for about five days. The Mission social worker told DCFS that P. was constantly falling out of her stroller, that Mother had been instructed to strap P. in, and that P. had hit her head several times during the family's stay at the Mission. Mother said that P. had figured out how to get out of her stroller, and fell even though she was strapped in.

DCFS also learned that the family had a dependency history in Riverside County. In 2006, that court sustained allegations of neglect, domestic violence by Mother against Christiana's father and by Christiana's father against Mother, and allegations concerning Mother's mental health problems, evidenced by two Welfare and Institutions Code section 5150[1] holds and Mother's admission that she had felt like killing herself. Christiana was out of Mother's care for a year.

A section 300 petition was filed on August 22, 2011. The children were not detained at that point, but on August 30, after additional investigation and another incident in which P. fell and hurt herself, the children were detained and placed in foster care.

The petition was not adjudicated for almost a year, in July of 2012. The time gap between the filing and adjudication was due in part to difficulties the court experienced in getting records about the previous dependency, in part due to difficulties in getting

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

records from San Diego about Mother's divorce from Christiana's father, and in part due to delays in getting a psychological evaluation for Mother.

During this period, on December 29, 2011, both children were placed with Christiana's father and his wife in San Diego. (DCFS was satisfied that he no longer posed a domestic violence risk), where they remained throughout the dependency, and where they have done well.

Also during this period, hearings were held and reports written, largely concerned with visits, especially after the children were moved to San Diego.

The information most relevant to this appeal is the information about Mother's mental health, which was a concern from the outset.

When DCFS first encountered Mother and the children, the social worker observed that the children were clean and appropriately dressed. They were up-to-date on immunizations and other medical care. They played nicely with each other, were developmentally on-target, and were bonded to Mother, who loved them. Mother was organized, sought appropriate medical care for her children, and had been able to transfer her welfare case from Riverside to Los Angeles.

However, the first DCFS social worker to speak with Mother noticed "odd behavior at times," and later observed her to be "paranoid" and "on edge," and recommended a mental health assessment. A social worker at a skid row project told DCFS that when Mother first came to the Mission, she was "not coherent, paranoid, and scared." A DPSS social worker reported that in August, Mother was delusional, believed that local churches were conspiring with her ex-husband to take the children, and was so hostile that the social worker asked a sheriff's deputy to monitor the appointment. A social worker at the Union Rescue Mission said that Mother was confrontational with other residents and with staff, and blamed Christiana for everything, sometimes yelling at her until she cried. That social worker said that Mother could be "a nice person and caring mother" but "then -- snap -- here we go."

3

A Department of Mental Health psychologist who attended an August team decision meeting evaluated Mother's behavior as "grossly inappropriate for the setting." Behaviors included, "isolation, mistrust, hostility, lack of social reciprocity, and tangentially," which could be dangerous to the children given their "developmental stage and the lack of protective factors."

Christiana had severe tantrums in foster care, and other difficulties, and it appeared that the problems pre-dated the dependency. P., too, had severe tantrums, and had a diagnosis of failure to thrive.

DCFS also learned that before they lived in the Union Rescue Mission, Mother and children were living with Mother's mother. Mother initially told DCFS that she had left her mother's home because the environment was negative and emotionally abusive, and later said that her mother was (or had been) an alcoholic and that as a child, she had been subjected to violence and sexual abuse by a brother and stepfather, in her mother's home. Mother had made similar statements in the dependency in Riverside, and made similar statements to the psychologist who evaluated her in this case. However, after the children were detained, Mother sought to have them placed with her mother, and denied those statements.

Throughout the dependency, Mother spoke of being the victim of theft and of verbal attacks and threats by shelter residents and people on the street. She said that the children had been victims of threats and assault at the shelter, although the social worker could see no marks or bruises. After the children were placed with Christiana's father, Mother once falsely accused him of being violent during a visit, and sometimes complained of things which were manifestly untrue -- for instance, she once complained to the social worker that the children's nails had not been cut in months, although their nails were short.

The psychological evaluation took place on September 25, 2011. The psychologist reported that Mother "appears to be experiencing mental health symptoms that are likely to impact her ability to parent effectively" that she "appears to be

4

experiencing symptoms related to a mood disorder as noted in her speech, thought process, thought content and self disclosures," and "presented with delusional and paranoid content throughout the evaluation which is of particular concern in regards to her ability to parent."

The evaluator noted that while Mother admitted that some of her "disclosures" were "a little weird," she continued to believe them. The evaluator opined that "This can potentially have adverse effects on her ability to parent and prevent her from obtaining the necessary and proper services for her children due to beliefs of conspiracy or perceived threat."

The evaluator recommended that Mother have a complete physical to rule out brain injury, that she receive reunification services once she was considered stable by her treating clinician, and that the children not be returned to her "at this time."

For the July 2012 jurisdictional and dispositional hearing, the court also had before it evidence that after the children were detained, Mother participated in some programs through the City of Los Angeles Department of Mental Health: a six to eight week program called Crisis Oriented Recovery Services, designed "to help learn skills to cope with and resolve the current crisis;" a weekly "seeking safety" group for people who had been diagnosed with post-traumatic stress disorder or alcohol or substance abuse, and some individual counseling as an adjunct to the seeking safety group. According to the Department of Mental Health counselor, Mother had demonstrated progress in establishing a trusting relationship with her counselor and insightfulness in identifying relevant treatment goals.

At the time of the hearing, Mother was living in a domestic violence shelter in Lancaster and on June 16, 2012, had enrolled in a program there. The program reported that Mother was participating, and had no "apparent issues impacting her daily functioning," but that signs of a "paranoid personality disorder" had begun to emerge.

On this and other evidence, the petition was sustained under section 300, subdivisions (b) and (j) on factual allegations that on July 19, 21, and 25, 2011, due to

5

Mother's failure to provide appropriate care and supervision, P. fell out of her stroller and hit her head and that on prior occasions, she fell out of her crib and hit her head; and that Mother has an "undiagnosed mental health issue, including but not limited to delusional and paranoid thoughts."[2]

Reunification services were ordered for Mother.

As to disposition, the court found that there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the children if they were returned home, and that there were no reasonable means to protect the children without removing them (§ 361, subd. (c)(1)), and ordered that the children were to remain with Christiana's father, who wished to care for both girls and to pursue legal guardianship for P.

Discussion

*Jurisdictional orders*

Mother's challenge to the sufficiency of the evidence concedes that there is sufficient evidence for the factual findings. She argues, however, that those facts do not support a finding that the children had suffered, or there was a substantial risk that they would suffer, serious physical harm or illness, as a result of Mother's failure or inability to adequately supervise or protect. (§ 300, subd. (b).)

As to the findings concerning P.'s accidents, Mother argues that P. was an active child who was able to climb out of the stroller harness through no fault of Mother's, and that the bump on the head caused P. no serious harm. She notes the evidence that P.'s doctor and foster mother described her as a very active child, and that evidence that P. suffered a laceration on her chin while in foster care, and also argues that by the time of the jurisdictional hearing, P. was no longer a toddler, so that similar incidents were unlikely to occur in the future.

---

[2] By the time the petition was sustained, there was evidence that Mother suffered from a mental illness.

As to the findings concerning her mental health, Mother argues the rule that "Harm to the child cannot be presumed from the mere fact of mental illness of the parent." (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 540.) She contends that DCFS did not meet its burden, because it did not specify how her illness put her children at risk of harm in the future.

"On appeal from an order making jurisdictional findings, we must uphold the court's findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings." (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185.)

We find substantial evidence for the trial court's ruling.

While it is possible to interpret the evidence concerning P.'s accidents in the manner which Mother suggests, there was also evidence that Mother did not secure P. into her stroller. It is also possible to conclude from all the facts that Mother was at least inattentive and distracted, and could not care for her children, putting them at risk.

As to Mother's mental health, the court had before it evidence that Mother was paranoid and irrational. She initiated confrontations with others and falsely accused others of causing harm to her and to the children, apparently believing that these things had really taken place.

Further, if Mother's initial statements to DCFS about her mother's home are believed, she moved her children into an abusive home. If her later statements concerning her mother's home are true, she moved her children from a safe home with her mother into a shelter.

Mother was diagnosed with paranoia, mood disorder, and delusions, and it is readily apparent that her confrontational attitude and inability to perceive reality placed the children not just at risk of emotional harm, which, as Mother argues, was not charged, but of physical harm.

7

*The Dispositional order*

Mother argues that there is no substantial evidence for the order, and that, to the contrary, she had demonstrated that she could safely care for her children. She cites the evidence concerning loving and appropriate visits with the children in April and May of 2012 (she does not seem to have had visits after that time), the evidence that she was in counseling, and the evidence that by the time the dispositional orders were made, she was living in a domestic violence shelter and thus had stable housing.

"A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . . [¶] [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." (§ 361, subd. (c)(1).)

We review the record in the light most favorable to the court's order to determine whether there is substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that the children would suffer the detriment specified in the statute. (*In re John M.* (2006) 141 Cal.App.4th 1564, 1569.) We find substantial evidence.

There was evidence of Mother's strengths, including her love for the children, and appropriate and positive visits with the children. She had had some counseling or therapy, although it is not clear that the crisis-oriented programs she attended earlier in the dependency were designed to, or did, address the mental health problems identified by the evaluation. However, there was also evidence that Mother was paranoid and irrational and that her mental health problems, which had not been fully treated, prevented her from safely caring for her children. That evidence supports the juvenile court's order.

8

Disposition

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                        ARMSTRONG, Acting P. J.


We concur:


        KRIEGLER, J.


        O'NEILL, J.*

---

* Judge of the Ventura Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.