Filed 9/29/23  In re Olivia E. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re OLIVIA E., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>NATHAN E.,<br><br>Defendant and Appellant. | F085319<br><br>(Super. Ct. No. JD143876-00)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Susan M. Gill, Judge.

Jesse Frederic Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant.

Margo A. Raison, County Counsel, and Ana M. Ovando, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Appellant Nathan E. (Father) appeals from a November 15, 2022 Kern County Superior Court dispositional order, which declared his child Olivia E. a dependent of the juvenile court under Welfare and Institutions Code[1] section 300, subdivision (b) and denied his request for placement pursuant to section 361.2. Father argues "there was insufficient evidence that placing [Olivia] with him would be detrimental to her." (Capitalization omitted.) For the reasons set forth below, we reverse the juvenile court's detriment finding.

## FACTUAL AND PROCEDURAL HISTORY

On September 26, 2022, the Kern County Department of Human Services (Department) filed a juvenile dependency petition alleging Olivia—then seven years old—came within the jurisdiction of the juvenile court under section 300, subdivision (b). Jessica F. (Mother) was identified as Olivia's mother and custodial parent. The petition stated Olivia "has suffered, or there is a substantial risk that [she] will suffer, serious physical harm or illness" "by the willful or negligent failure of [Mother] to provide the child with adequate food, clothing, shelter, or medical treatment" and/or "by the inability of [Mother] to provide regular care for the child due to [Mother]'s mental illness, developmental disability, or substance abuse." It specified:

> "The family has been homeless for the past three years. The family was residing in one bedroom for three children and two adults.[2] On September 22, 2022, the family was found to be sleeping on the floor of the residence. The home posed a health and safety hazard with trash, rotting food, clothing and miscellaneous items cluttering the home. [Mother] could not locate formula for the child's sibling due to the condition of the home. There was drug paraphernalia in the home, as well as two methamphetamine glass pipes were found in the bedroom within reach of

---

[1] Unless otherwise indicated, subsequent statutory citations refer to the Welfare and Institutions Code.

[2] The adults are Mother and M.L. The three children are Olivia and her two half-siblings. Mother is the mother of all three children while M.L. is the father of Olivia's half-siblings.

2.

the children. [Mother] does not have a reasonable plan for housing for the children. [¶] . . . [¶] . . . . On September 21, 2022, [Mother] used methamphetamine. . . ." (Boldface omitted.)

Father was identified as Olivia's alleged father.

The detention hearing was initially held on September 27, 2022. Father was not present. Mother's counsel made the following offer of proof:

> "Your Honor, if called to testify, [Mother], who's present in the courtroom, would testify as follows. . . .
>
> "So with regard to Olivia . . . , the biological father is [Father]. There are no other possible fathers. [¶] [Father] was residing with . . . [M]other at the time that she became pregnant. He did reside with her during the pregnancy. [¶] He was at the hospital when Olivia was born. [¶] He is listed on the birth certificate. He did sign paperwork to be on the birth certificate. No one other than . . . [M]other and [Father] and the child are listed on the birth certificate. [¶] He has acknowledged being the father of the child. He has not denied being the father of the child. [¶] . . . [M]other would testify that there is a child support order in Kern and that she received some child support up through June 22nd of this year, 2022. [¶] [Father] lived with Olivia until she was one year old. [¶] He has spent the night with the child, and as I stated before, there are no other possible fathers."

The court accepted the offer of proof. When it inquired about Father's whereabouts, Mother's counsel stated: "[M]other did indicate that [Father] may be in . . . Missouri." The court appointed Father's counsel, who requested and was granted a continuance. Thereafter, Father's counsel contacted Father.

The detention hearing recommenced September 29, 2022. Father—who was not present—was declared Olivia's presumed father by the court. The following exchange then occurred:

> "[FATHER'S COUNSEL]: . . . . I am making a request that the child be released to [Father]. I know we're not prepared to do that today, but as there are no allegations and he's noncustodial, I would ask the Department to do that analysis.
>
> "THE COURT: Okay. Does he intend to stay in Missouri?

"[FATHER'S COUNSEL]:  Yes.

"THE COURT:  Thank you."

The court determined a prima facie showing was made that Olivia came within section 300.  It ordered Olivia's removal from Mother's custody; supervised visits twice a week between Olivia and Mother; and supervised virtual visits twice a week between Olivia and Father.  Olivia and her two half-siblings—then two years old and one month old, respectively—were placed in a resource family home in Bakersfield.

Visits between Olivia and Mother were conducted on September 30th, October 3rd, October 7th, October 10th, October 13th, and October 18th.[3]

During the September 30th visit, Olivia told Mother "she loves and misses her" and Mother "comforted Olivia by hugging her."  Olivia wanted a " 'family hug' " with Mother and her half-siblings, whom she called her "baby sister" and "baby brother." "This resulted in the family coming together as one to do a family hug . . . ."  In general, Olivia "laughed and giggled" and "appeared to be having fun."  Near the end of the visit, Olivia "once again requested for a family hug" and "[t]he family got all together to join in on the hug."

During the October 3rd visit, Mother "provided snacks and beverages" for Olivia. She briefly "allowed for Olivia to hold her baby brother in her arms."  Mother "continued interacting" with Olivia and tickled her at one point.  "At the end of the visit, Olivia stated that she didn't want to leave."

During the October 7th visit, Mother "gave all her children hugs and welcomed them."  She also brought snacks and "candy lollypops."  When Olivia "shared that she lost a tooth," Mother "comforted her . . . ."  Mother "sat around the children and colored with Olivia."

---

[3] Visits scheduled for October 19th and 25th were cancelled.  References to dates are to dates in 2022 unless otherwise stated.

During the October 10th visit, Mother "was very happy to see her children . . . ." She brought chicken, juice boxes, and various toys, which "excited" Olivia. Mother and Olivia "played pretend kitchen and pretend eating . . . ." "The family laughed together multiple times." Mother "hugged and tickled her children." She "continued to re-assure the children that she loves them but that she 'needs to do what she needs to do.' " Olivia "said she did not want to leave the visit" and Mother "tried to comfort and told Olivia not to make it harder for her."

During the October 13th visit, Mother brought food, candy, and toys. The family "all sat around the table and played together." Mother "explained to Olivia that [Father] would start virtual calls with [her]." Olivia "smiled and appeared excited to speak with [Father]." Mother "played pretend kitchen" with Olivia and later painted her nails.

During the October 18th visit, "[t]he family greeted each other with a hug, a kiss and said hello." They "played with the toys in the room, with the building blocks and with the board games" and later "played 'tickle monster' and colored." Near the end of the visit, Mother "read a book to the children while the children ate snacks." They "exchanged a hug, a kiss, said goodbye and I love you."

In early October 2022, Father conversed with Department social workers over the phone. He provided his address in Missouri and stated he "purchased a house" and resided with his girlfriend and her three children. Father "worked over the last five years at a processing plant making car parts" and "last worked about three months ago." He "had to stay home with the children" because his girlfriend "[got] a new job," but he recently received "a job offer helping raise pigs." Father's last contact with Olivia was around three years ago. He pointed out Mother "always changes her phone number." Father "attempted other way[s] to communicate with Olivia but eventually lost contact." He "has thought of Olivia often" and expressed a willingness to take custody of her. Father "denied suffering from any physical, emotional or mental disabilities" and "denied currently using any type of controlled substances, drugs or alcohol." He acknowledged

5.

"he last smoked marijuana about fifteen years ago" and "was arrested for underage drinking, sometime in 2001." Father "denied that he has ever been convicted of a crime," "denied any domestic violence incidents or cases in his past or current relationship," and asserted he was "not currently on probation or parole."

Video calls between Olivia and Father were conducted on October 14th, October 17th, October 22nd, and October 24th.

During the October 14th video call, Olivia stated "she loved and missed [Father]" and "would be sad if she could not see him." Father replied "he missed her too" and "would do what he could to see her." When Father mentioned he might "get [Olivia] home with [him]" "if all goes well," Olivia told him "he would need to buy tickets for her siblings, because they are family, they stick together." Upon request, Father "walked [Olivia] threw [*sic*] the home showing her his house." He mentioned he "worked rally [*sic*] hard, and was able to get his home." Olivia "sang a song for [Father] and he told her that it was pretty." When Father remarked he "was not good" at singing and would not let Olivia hear him sing, Olivia stated "she would like it because he is her dad." At one point, Father briefly introduced his girlfriend's children to Olivia. Olivia "asked [Father] to promise her that [he] will get [her], because [she] miss[es] [him]." Father "said that he would do what he could." Later, Olivia said, " 'I love seeing you dad.' " Father answered, " 'I love seeing you too, and we are going to do this (Visit) on Monday.' " Olivia responded, " 'I love you dad.' " As the call was ending, the two "mad[e] funny faces at each other and exchanged I love you['s]." Throughout the call, Father and Olivia "kept there [*sic*] focused [*sic*] on each other and seemed to enjoy their time."

During the October 17th video call, Father and Olivia "played games and made different shapes with their hands." Father commented "that if he was to come to California to visit that he had hoped they could take a trip to the beach." He "changed his background and the camera" and told Olivia "it was magic." Father "tried helping Olivia

6.

find the background and she found the Emoji's." "They began playing with the Emoji." Until the end of the call, Father and Olivia "put more emoji's up and shared in some laughs . . . ."

During the October 22nd video call, Father and Olivia conversed about the weather where Father lived. Olivia said, " 'I wish I were there with you.' " Father replied, "I wish you were here also." The two "played together with the [video call software's] emoji features" and "took turns sharing different emoji's with each other and described what it meant to them." Later, Father introduced his girlfriend to Olivia. Father's girlfriend "complemented Olivia and said kind words" and "shared emoji's back and forth" with her.

During the October 24th video call, Father told Olivia he "started his new job" "caring for pigs." Olivia played with slime she received at school from her teacher. She "pretended to make slime doughnuts and cookies." Father "played along . . . ." Olivia asked if Father's girlfriend's daughter "could join the [video] call and play." Father's girlfriend's daughter "joined the call" and "brought one of her pop it toys to show Olivia." Later, Olivia and Father's girlfriend's daughter shared their "Barbie's" and "pretended to play Barbie's together." Father "showed Olivia the play room" and Olivia "was excited because there was a giant Barbie doll house" and "Barbie accessories." Olivia "pretended to be the mommy Barbie" and Father's girlfriend's daughter "pretended to be the children." Toward the end of the call, Father "told Olivia good-bye and 'I love you.' " Olivia responded, " 'I love you too.' "

On October 27, 2022, during a video call with a Department social worker, Father stated he "has really enjoyed connecting back with Olivia" and "has enjoyed the time with her on [the video calls]." When asked whether he "had any plans to come to California to see Olivia," Father indicated he did not but "would like to come to see her." He added "he could use some help paying for [a] plane ticket." When asked how he and his girlfriend would feel if Olivia lived with them, Father asserted he "would love that"

and his girlfriend "is excited to get to know Olivia." Father reiterated he had no criminal history and had no substance abuse issues. The social worker advised Department would "complete the ICPC[4] process, . . . an out of state process for clearance of individuals, caregivers, and parents." Father "said he was open [to] the investigation and he was open to a home assessment."

The combined jurisdiction/disposition hearing was held on November 15, 2022. Father was not present. Counsel for both Mother and Father "submitt[ed] on juris." The court found Olivia to be a person described by section 300, subdivision (b). The following exchange occurred after the court proceeded to the disposition phase:

> "[FATHER'S COUNSEL]: Your Honor, I understand that the Department's request is to order an ICPC for [Father] in Missouri. In reviewing his situation, I would note that [Department's social study] says he's not currently employed. He is currently employed, that's why he's not with us today. He has three other children. I think his girlfriend's three living in his home.
>
> "The visits with Olivia are going quite well. So we are asking that placement with [Father] just be ordered today. He is willing to do the parenting and neglect class, although, I told him that's just generally something asked of people, but I don't see any basis of him for needing to complete that or any need for supervision. In my reading, Olivia seems excited about the possibility of going to live there so that is our request for today.
>
> "THE COURT: Thank you. You know, when I read the report, I made a note to myself asking, if [Father] lived in California, would the recommendation be for placement of Olivia with him because there could be supervision, would it?
>
> "[DEPARTMENT'S COUNSEL]: Yes. The Department indicated yes.
>
> "THE COURT: So the biggest factor is we need supervision.

---

**4** "ICPC" refers to the Interstate Compact on Placement of Children (Fam. Code, § 7900 et seq.).

8.

"[DEPARTMENT'S COUNSEL]:  Correct.

"THE COURT:  And that's the only reason that ICPC would be necessary because, otherwise, it doesn't apply.

"[DEPARTMENT'S COUNSEL]:  Correct.  [¶] . . . [¶]

"THE COURT:  Okay.  [¶]  . . . [D]o you want to speak to the request?

"[DEPARTMENT'S COUNSEL]:  Your Honor, the Department – well, the Department's concern is that while the visits are going well, the last time [Father] had previously had contact with Olivia was when she was two or three.  It's been quite a few years ago.  The Department would like to have some supervision prior to the placement.  Probably move more towards that direction, just feel it's a bit premature.

"THE COURT:  Thank you.  [¶]  . . . [A]nything you want to add on that issue?

"[MOTHER'S COUNSEL]:  Your Honor, we would agree with [Department's counsel].  The child has been with . . . [M]other for most of her life and that relationship, while the reports on the visits are nice, it's not yet developed.  And so we would concur with [Department's counsel].

"THE COURT:  Thank you.  [¶] . . . [¶]

"[FATHER'S COUNSEL]:  Your Honor, I would just note, I understand the desire for supervision, but I don't see anything in any of the reports that give rise to concern about [F]ather's ability to care for the child.  I just don't think the legal standard is it's nice to have supervision.

"THE COURT:  Thank you."

Thereafter, the court pronounced:

"Based on the evidence before the Court, I'll make the following findings and orders.  First of all, with respect to [Father], if I were to place Olivia with [Father], I'd be taking her away from her siblings, away from [M]other's ability to reunify, and placing her with a father she's never lived with, and I don't know if he's even come out here to visit since the case has started.  So I think supervision is important to make sure that he is as appropriate as he seems to be on paper, and in the interactions that the Department has with him, and to make sure that Olivia would be safe there.

9.

I think that's appropriate to have supervision, and to have that, we need ICPC.

"The alternative of that is have him have some face-to-face visits with her, have some supervision of that, reports on that. Which I say because even though we're at disposition, I don't know how long ICPC will take and I want to make sure we all understand there are alternatives to having supervision. But at this point, with no face-to-face visits, and face-to-face evaluation even I'm not finding that. I do find it would be detrimental to Olivia to place her with her father at this time without supervision."

The court adjudged Olivia a dependent of the juvenile court pursuant to section 300, subdivision (b) and found—by clear and convincing evidence—there is or would be a substantial danger to Olivia's physical health, safety, protection, or physical or emotional well-being if she were returned home and there are no reasonable means by which to protect Olivia's physical health without removal. The court ordered Olivia's removal from Mother's custody; six months of family reunification services for Mother and Father; counseling for Mother on parenting, child neglect and substance abuse; counseling for Father on parenting; supervised visits twice a week between Olivia and Mother; supervised visits twice a week between Olivia and Father; and initiation of ICPC on Father's behalf. Pursuant to section 366.21, subdivision (e), a status review hearing was calendared for May 15, 2023.

## DISCUSSION

I.    **Section 361.2**

"If a court orders removal of a child pursuant to Section 361,[5] the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that

---

**5** "Section 361 specifies the circumstances which constitute grounds for removal of a child from his or her home." (*In re Michael D.* (1996) 51 Cal.App.4th 1074, 1082.)

10.

parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).) "The term ' "custody" ' as used in section 361.2, refers to the parent's 'right to make decisions pertaining to the child' and to have 'legal possession of the child.' [Citation.]" (*In re Noe F.* (2013) 213 Cal.App.4th 358, 368.) On the other hand, " ' "[p]lacement" ' refers to 'where the child shall live during the dependency proceeding.' [Citation.]" (*Ibid.*; see *In re Austin P.* (2004) 118 Cal.App.4th 1124, 1131 (*Austin*) ["[T]he words 'place' and 'placement' in section 361.2, subdivision (a) connote a temporary arrangement that necessarily involves the ongoing supervision of the juvenile court."].) "If the court places the child with the noncustodial parent, the court may terminate its jurisdiction over the child [citation], maintain jurisdiction pending a home visit [citation], or maintain jurisdiction with court supervision [citation]." (*In re Liam L.* (2015) 240 Cal.App.4th 1068, 1081, citing § 361.2, subd. (b)(1)-(3).) "In examining section 361.2, subdivisions (a) and (b), it is clear that the Legislature envisioned a two-step process: under subdivision (a), the court examines whether it would be detrimental to temporarily place a child with the nonoffending noncustodial parent; under subdivision (b), the court decides whether that placement should be permanent and whether the court's jurisdiction should be terminated." (*Austin*, *supra*, 118 Cal.App.4th at p. 1131.)

"In summary, when a nonoffending noncustodial parent requests custody under section 361.2, subdivision (a), he or she is requesting sole legal and physical custody of a child. However, the court may not immediately grant that parent sole legal and physical custody. The court must first determine whether it would be detrimental to the child to temporarily place the child in that parent's physical custody. If there is no showing of detriment, the court must order the [social services a]gency to temporarily place the child with the nonoffending noncustodial parent. The court then decides whether there is a need for ongoing supervision. If there is no such need, the court terminates jurisdiction and grants that parent sole legal and physical custody. If there is a need for ongoing

11.

supervision, the court is to continue its jurisdiction." (*Austin*, *supra*, 118 Cal.App.4th at pp. 1134-1135.)

"A detriment evaluation requires that the court weigh all relevant factors to determine if the child will suffer net harm." (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1425 (*Luke*).) "Only clear and convincing evidence can establish the necessary detriment." (*In re A.C.* (2020) 54 Cal.App.5th 38, 43.) "Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt." (*Luke*, *supra*, at p. 1426; see *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998 (*O.B.*) ["The standard of proof known as clear and convincing evidence demands a degree of certainty greater than that involved with the preponderance standard, but less than what is required by the standard of proof beyond a reasonable doubt."].) "When the parent [requesting custody] is competent, the standard of detriment is very high." (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1263 (*Patrick*); see *In re John M.* (2006) 141 Cal.App.4th 1564, 1569 (*John*) [§ 361.2, subd. (a) evinces a legislative preference for placement with a nonoffending noncustodial parent].)

## II.    Standard of review

"We review a court's dispositional order for substantial evidence." (*In re K.B.* (2015) 239 Cal.App.4th 972, 979 (*K.B.*); see *O.B.*, *supra*, 9 Cal.5th at p. 1006 ["Substantial evidence is evidence that is 'of ponderable legal significance,' 'reasonable in nature, credible, and of solid value,' and ' "substantial" proof of the essentials which the law requires in a particular case.' "].) "[A]ppellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands. . . . [W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.  Consistent with well-established principles governing review for sufficiency of the evidence, in making

12.

this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*O.B.*, *supra*, at pp. 995-996; accord, *In re V.L.* (2020) 54 Cal.App.5th 147, 155.) "Thus, in order to succeed on appeal, [the appellant] must demonstrate that there is no evidence of a sufficiently substantial nature to support the court's order." (*K.B.*, *supra*, at p. 979.)

## III. Analysis

We conclude there is no substantial evidence from which a reasonable trier of fact could have found it highly probable Olivia would suffer detriment if she were placed with Father.

At the outset, though we view the record in the light most favorable to the juvenile court's order, said record shows Father "is a competent, caring and stable parent." (*Patrick*, *supra*, 218 Cal.App.4th at p. 1263.) He is a homeowner, lives with his girlfriend and her three children, and is involved in those children's upbringing. Father previously worked at an automotive parts plant and recently obtained a job raising pigs. He admitted he was arrested for underage drinking over two decades ago but otherwise denied having "ever been convicted of a crime" or being "on probation or parole." (See *ibid.* [the father lacked criminal history].) He "denied any domestic violence incidents or cases in his past or current relationship." (See *ibid.* ["no referrals to child welfare services"].) Father acknowledged "he last smoked marijuana about fifteen years ago" but otherwise "denied currently using any type of controlled substances, drugs or alcohol." He also "denied suffering from any physical, emotional or mental disabilities." (See *ibid.* ["no indication of substance abuse or mental illness"].) Although Father only lived with Olivia until she was one year old and last contacted her approximately three years before dependency proceedings commenced, he continued to pay child support. (See *ibid.* ["[The father] paid child support every month for 11 years without knowing where his

13.

son was."].) "When he learned of [Olivia]'s whereabouts, [he] immediately came forward and requested placement . . . ." (*Ibid.*) Father—who resides in Missouri— participated in four scheduled video calls with Olivia, all of which exhibited positive interactions between the two. (See *ibid.* [the father "visited and contacted his son whenever possible"].)

In denying placement with Father, the juvenile court reasoned: (1) placement would "tak[e] [Olivia] away from her siblings"; (2) placement would take Olivia "away from [M]other's ability to reunify"; (3) Olivia has "never lived with" Father before; (4) Father has not "come out here [to California] to visit since the case has started" and there have been "no face-to-face visits"; and (5) supervision via the ICPC is needed "to make sure [Father] is as appropriate as he seems to be on paper" and "make sure that Olivia would be safe there." These justifications do not support the detriment finding.

"[A] court is authorized to evaluate the appropriateness of keeping siblings together, and to consider sibling relationships as one factor, among many, when determining detriment for purposes of its placement decisions." (*Luke*, *supra*, 107 Cal.App.4th at p. 1422.) The record does show affectionate displays by Olivia toward her two younger half-siblings (a toddler and a baby) during Mother's visits. In addition, during her initial video visit with Father, Olivia told him "he would need to buy tickets for [her and] her siblings" to go to Missouri "because they are family, they stick together." These deeds and words alone, however, do not sufficiently demonstrate Olivia is so "extremely bonded" with her half-siblings (*id.* at p. 1426) and her relationship with them is so "much closer than in normal sibling relationships" (*id.* at p. 1427) that she would suffer emotional harm if she were separated from them. (Cf. *id.* at p. 1426 [the child "cried and became depressed" at the prospect of being separated from his custodial parent and siblings].)

Next, the court claims placement with Father would take Olivia "away from [M]other's ability to reunify . . . ." While we recognize there is "a preference towards

14.

parental reunification" (*Luke*, *supra*, 107 Cal.App.4th at p. 1425), nothing in the record indicates "a move would prevent [Mother] from reunifying" (*John*, *supra*, 141 Cal.App.4th at p. 1570). As mentioned, after a placement is made pursuant to section 361.2, the court still has discretion to order reunification services to the formerly custodial parent (§ 361.2, subd. (b)(3); *In re Karla C.* (2010) 186 Cal.App.4th 1236, 1244) or terminate dependency jurisdiction (§ 361.2, subd. (b)(1); *K.B.*, *supra*, 239 Cal.App.4th at p. 981).

As for Olivia having "never lived with" Father before,[6] this factor is not determinative. (See *In re C.M.* (2014) 232 Cal.App.4th 1394, 1403 ["[N]either [the child]'s wish to remain . . . in the only home she had ever known, nor the alleged lack of an established relationship with [the] father, was sufficient to constitute substantial evidence of the high level of detriment required under section 361.2[, subdivision ](a)."].)[7]

The court's emphasis on Father not "com[ing] out here [to California] to visit since the case has started" and the lack of in-person visits seemingly discounts the practical reality of maintaining relationships across state lines. The record indicates Father—during the time he became aware of dependency proceedings and reconnected with Olivia via video calls—was a stay-at-home parental figure for his girlfriend's children due to his girlfriend's new job and in the process of finding and procuring a new job himself. (Cf. *In re Solomon B.* (2021) 71 Cal.App.5th 69, 75, fn. 4 [ongoing health

---

[6] Technically speaking, according to Mother's offer of proof at the detention hearing, Father lived with Olivia "until she was one year old."

[7] We point out the record shows Olivia consistently expressed her love for and her desire to be with Father and appeared to get along with Father's girlfriend and her children, even playing dolls with one of them during a video call. (See *Patrick*, *supra*, 218 Cal.App.4th at p. 1265 ["[T]he court should have placed greater weight on the long-term benefits [the child] would gain from becoming an integrated member of a family that included a father, stepmother, brother and sister."].)

risks and travel restrictions due to COVID-19 pandemic].) He also told a Department social worker "he could use some help paying for [a] plane ticket." That Father did not drop everything and travel to California between September 29, 2022 (the date he was declared Olivia's presumed father) and November 15, 2022 (the date of the combined jurisdiction/disposition hearing)—a period of about one-and-a-half months—should not militate against placement.

Finally, we address the court's final justification: supervision via the ICPC is needed "to make sure [Father] is as appropriate as he seems to be on paper" and "make sure that Olivia would be safe there." Notably, an exchange between the court and Department's counsel during the disposition phase of the combined jurisdiction/disposition hearing revealed Department would have recommended placement with Father had he lived in California because "there could be supervision . . . ." Because Father resides in Missouri, however, the court and Department's counsel agreed "ICPC would be necessary . . . ."

To the extent the court relied upon the necessity of supervision to rationalize denial of placement, the court puts the proverbial cart before the horse. As discussed, the Legislature "envisioned a two-step process" when it enacted section 361.2. (*Austin*, *supra*, 118 Cal.App.4th at p. 1131.) "The court must *first* determine whether it would be detrimental to the child to temporarily place the child in [the nonoffending noncustodial] parent's physical custody. If there is no showing of detriment, the court must order the [social services a]gency to temporarily place the child with the nonoffending noncustodial parent. The court *then* decides whether there is a need for ongoing supervision." (*Id.* at p. 1135, italics added; see § 361.2, subds. (a)-(b).) "If there is a need for ongoing supervision, the court is to continue its jurisdiction." (*Austin*, *supra*, at p. 1135.)

To the extent the court believed ICPC monitoring was a prerequisite for placement, it was mistaken. (*Patrick*, *supra*, 218 Cal.App.4th at p. 1264; *John*, *supra*,

141 Cal.App.4th at p. 1575.) "The ICPC governs conditions for out-of-state 'placement in foster care or as a preliminary to a possible adoption.' " (*John*, *supra*, at p. 1573, quoting Fam. Code, § 7901, art. 3, subds. (a), (b).) "Placement with an out-of-state parent need not follow ICPC procedure, as is plain from the statutory language." (*John*, *supra*, at p. 1573.)

It appears the court was reluctant to place Olivia with Father because he was " 'to some degree, . . . an unknown entity' . . . ." (*John*, *supra*, 141 Cal.App.4th at p. 1568.) If the court believed the information at its disposal was deficient, its initiation of ICPC makes sense. "While . . . ICPC compliance is not required for an out-of-state placement with a parent, nothing in the ICPC prevents the use of an ICPC evaluation as a means of gathering information before placing a child with such a parent." (*Id.* at p. 1572.) A court can also explore alternative means of investigating the nonoffending noncustodial parent. (*Ibid.*; see, e.g., *Patrick*, *supra*, 218 Cal.App.4th at p. 1264 [ordering the father "to comply with services, regularly communicate with [social services a]gency and make [the child] available to the social worker"].) However, instead of denying Father's request for placement, "the court should have . . . continue[d] the hearing,[8] leaving [Olivia] in h[er] temporary placement [at the resource family home] for the period of time necessary to gather information about [Father]." (*John*, *supra*, at p. 1572.) Because Father "is a parent, the appropriate investigation is a basic one, less rigorous than the investigation necessary for placement with a more distant relative . . . ." (*Id.* at p. 1573.) While his "geographical distance from [California] necessitates a greater effort to garner information, it should not subject him to greater scrutiny." (*Ibid.*)[9]

---

[8] The record does not show counsel requested a continuance at the combined jurisdiction/disposition hearing. (See § 352, subd. (a)(1).) Nonetheless, the court has authority to continue a hearing on its own motion upon a showing of good cause. (See *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1798.)

[9] Father does not raise any issues concerning ICPC monitoring.

## DISPOSITION

The detriment finding is reversed.  The matter is remanded to the juvenile court with directions to hold a new dispositional hearing on the issue of placement under section 361.2, subdivision (a).  At said hearing, the court may order Department to obtain information about the suitability of Father's home, either through the ICPC process or by alternative means.  The court shall make its placement decision after receiving any information it deems necessary and evaluating the criteria in section 361.2 in a manner consistent with this opinion.  (*John*, *supra*, 141 Cal.App.4th at p. 1576.)  Nothing in this opinion should be construed to prevent the court from considering new evidence or changed circumstances that may have arisen during the pendency of this appeal.  (*Patrick*, *supra*, 218 Cal.App.4th at pp. 1265-1266.)  In all other respects, the dispositional order is affirmed.


                                                   DETJEN, Acting P. J.

WE CONCUR:


PEÑA, J.


MEEHAN, J.

18.