Filed 8/28/13  In re Aaliyah H. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re AALIYAH H., a Person Coming Under the Juvenile Court Law. | D063705 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>AMANDA H. et al.,<br><br>        Defendants and Appellants. | (Super. Ct. No. SJ012866) |

APPEALS from a judgment of the Superior Court of San Diego County, Garry G.

Haehnle, Judge.  Affirmed.

Neil R. Trop, under appointment by the Court of Appeal, for Defendant and

Appellant Christopher H.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant

and Appellant Amanda H.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Caitlin E. Rae and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

Julie E. Braden, under appointment by the Court of Appeal, for Minor.

Amanda H. and Christopher H. (the parents) appeal following the jurisdictional and dispositional hearing in the juvenile dependency case of their daughter, Aaliyah H. Amanda contends the jurisdictional finding and the order removing Aaliyah from her custody are unsupported by substantial evidence. Christopher contends the juvenile court erred by declining to place Aaliyah with him. We affirm.

BACKGROUND

Aaliyah was born in March 2006. The parents divorced in Hawaii in December 2009. The Hawaii court ordered joint legal custody and awarded Amanda sole physical custody of Aaliyah. Christopher was allowed supervised visits until Aaliyah was six years old, then unsupervised visits "[s]ubject to [Aaliyah]'s comfort level."

Amanda alleged domestic violence by Christopher, and the Hawaii family court granted her a temporary restraining order. One of Amanda's allegations was that Christopher had thrown a cup against a wall, and the cup had ricocheted and accidentally hit Aaliyah, injuring her. Christopher admitted the incident had occurred, but "stated that they were actually playing during that time and that Aaliyah was laughing about it." Christopher was arrested for violating the restraining order by contacting Amanda soon after the order issued. There were no documented incidents of violence by Christopher in

2

other relationships, and aside from the arrest, he had no criminal history. He had no child welfare history.

During the divorce proceedings, Christopher was concerned about Amanda's mental state and ability to care for Aaliyah, but did not mention it to the Hawaii family court. He had no proof, was resigned to the fact that Amanda would do anything to keep him away from Aaliyah and lacked the money to finance further litigation.

Immediately after the divorce, Amanda moved to San Diego with Aaliyah. Christopher remained in Hawaii and sought custody in the family court there. The Hawaii court told Christopher it had no jurisdiction, and he should file for custody in California. Christopher called the family court in San Diego and was told it was a matter for Hawaii.

Christopher remarried and, in July 2011, he and his new wife had twin sons. Christopher had very little contact with Aaliyah. He did not exercise his right to visit because Amanda did not allow it. She insisted on supervising visits herself and required Christopher to pay her visitation-related expenses although he had no money. In mid-2011, Christopher visited Aaliyah in San Diego.

A maternal aunt (the aunt) sent Christopher photographs of Aaliyah and kept him informed of her well-being. Christopher spoke with Aaliyah when she visited the aunt.[1] The aunt told Christopher, with little detail, that Amanda was having problems. He wanted to do something, but "it was hard" because he was "so far away." He spoke with

---

[1]     In 2012, Aaliyah visited the aunt once or twice a month.

lawyers, but they told him that without evidence that Amanda was an unfit mother, he would be "wasting [his] time."

Meanwhile, in August 2011, the San Diego County Health and Human Services Agency (the Agency) began receiving child welfare referrals regarding Aaliyah. The referrals alleged Amanda had mental health issues; she was addicted to prescription medication; and she blacked out in her car for up to 16 hours about twice a week, leaving Aaliyah unattended and with access to the medication. Amanda and Aaliyah were homeless and slept in the car or in a storage unit. Aaliyah's school attendance was poor and she was often tardy. She showed signs of emotional regression and took medication for attention deficit hyperactivity disorder (ADHD).

The Agency offered Amanda services and gave her an action plan "to demonstrate her willingness and ability to stabilize her medication and secure adequate and appropriate housing . . . ." Amanda did not carry out the plan and claimed she had no problems. In early March 2012, she obtained prescriptions for morphine on two successive days.[2] In May, Amanda and Aaliyah were evicted from a shelter due to Amanda's erratic behavior and misuse of prescription medication.

In late October 2012, Christopher and his family moved from Hawaii to Mississippi. In October or November, the Agency informed Christopher of its involvement with Aaliyah and Amanda. He contacted the Hawaii family court again to

---

[2] Later that month, Amanda was arrested for driving under the influence of a controlled substance. No charges were filed. Amanda said, "I'm allowed to take my medication. I wasn't under the influence of any illegal drug."

4

seek custody of Aaliyah. The Hawaii court said it had no jurisdiction and told Christopher he should file for custody in California.

On November 26, 2012, the Agency received another referral. On November 28, social worker Jennifer Venegas interviewed Aaliyah. Aaliyah said she prepared her own meals, such as "cookies and energy bars," as Amanda was often sleeping. Aaliyah was scared of Amanda. Amanda disciplined her by yelling at her and hitting her in the head with a plate. Aaliyah and Amanda took prescription medication, and Amanda took Aaliyah's Ritalin. Amanda's medication was supposed to calm her, but it did not help, and "[s]ometimes it [made] her yell more."

On November 28, 2012, Venegas interviewed Amanda. Before the interview began, Venegas saw Amanda swallow some pills. Amanda was extremely thin and her tongue was pasty. She had many scabs on her face and ear that appeared to be the result of her picking at herself. She "displayed a wide range of mood swings and anger" and was defensive, agitated and loud. She had difficulty staying on track and made random statements and inappropriate comments.[3] When Venegas mentioned misuse of prescription medication, Amanda replied, "How is it abusing if it's prescribed to me?" She said it was "fine" for her to take Aaliyah's medication because they had "the same doctor, same prescription, and same dosage." Venegas repeatedly attempted to explain the dangers of using medication other than as prescribed. Amanda rolled her eyes and

---

[3] For example, Amanda said, "I'm leaking bodily fluids and I feel really dirty right now."

5

said, "Fine[,] I won't do it again." She also said, "If I find a pill in my car, it was mine. It was prescribed to me. I can take it."

Amanda did not appear for a drug test on November 28, 2012. When Venegas asked her why, Amanda screamed, "How would you feel if you were ass raped."[4] Venegas tried to calm Amanda, but she continued to yell. The next day, Amanda tested positive for marijuana. She attributed the positive test to being close to friends who were smoking marijuana, and to unwittingly eating cake containing hashish. Amanda later said she began using marijuana when she was about 14 years old, which would have been in 1997 or 1998.

On November 28, 2012, the Agency and Amanda agreed on a safety plan: Aaliyah would live with a nonrelative extended family member and Amanda would have supervised visits. Christopher did not contact Aaliyah during the two months she was in that home. Amanda's visits were sporadic, and she spent most of her visitation time talking on the telephone or smoking cigarettes.

On December 4, 2012, Venegas returned a call from Christopher. She told him of the Agency's concerns that Amanda had been abusing prescription drugs and neglecting Aaliyah. Christopher said he had spoken to Amanda two weeks earlier when he had called to speak with Aaliyah. He had not seen Aaliyah in almost one and one-half years, and had not spoken with her for a month or two because Amanda forbade it. He had become increasingly concerned about Amanda's erratic behavior and abuse of

---

4    Amanda reported the rape to the police and said Aaliyah was present during the attack, which took place in a vacant home.

prescription medication, but was unable to prove the abuse and could not financially afford to take any action.

On December 5, 2012, the Agency and the parents agreed on "[a]n action plan" allowing Aaliyah to remain with the nonrelative extended family member until Amanda became stable or Christopher was able to assume care of Aaliyah. Amanda was instructed to "stabilize her medical and mental health needs," find a safe home and provide a list of her prescribed medications and letters from her doctors stating why the medications were needed. Christopher "was referred to family court for custody related matters."

Amanda did not provide the list or the letters. On December 11, 2012, her primary care physician, Dr. Paul Hubley, said Amanda was "prescribed numerous medications by different doctors" and went to hospital emergency rooms seeking prescriptions. Dr. Hubley had refused to refill a prescription for pain medication and referred Amanda to a pain management specialist. Amanda was unhappy because the specialist chose "to wean her off of some of her medications." Dr. Hubley believed Amanda might have mental health issues. A year earlier, she had claimed to have parasites, picked at her skin, and brought in the results, along with urine samples she said contained parasites. Dr. Hubley had referred Amanda to a psychiatrist, but she said she did not need a psychiatrist. Amanda claimed to have ADHD and switched health care providers until she found one who made that diagnosis. Amanda complained excessively of pain in Aaliyah's presence.

On December 12, 2012, Venegas told Christopher it was not safe to return Aaliyah to Amanda's care and he should pursue custody in the Hawaii family court. Venegas

7

referred Christopher "to military services." She said if he did not seek custody, the Agency would file a dependency petition.

On December 15, 2012, the Agency received a voice mail from Christopher saying he was trying to hire a lawyer to seek custody of Aaliyah and had appointments the next week. Christopher asked for a return call from the Agency.

On December 24, 2012, social worker Natalie Dinneny left Christopher a voice mail asking for "the current status of custody and the court." Christopher called back that day and said he had been unable to find an attorney and did not know what to do. Dinneny gave him the telephone numbers of the Family Law Self-Help Center, the San Diego Volunteer Lawyer program and the family court in San Diego. She told Christopher "she would give him a week to take care of this" and she would try to obtain information about resources in Mississippi. Christopher contacted the family court in San Diego and was told he would have to come to California and hire an attorney.

On December 27, 2012, an Agency social worker telephoned the Mississippi family court and was told that because three states were involved, the social worker had to speak with a guardian ad litem who was out of the office until January 4, 2013. On January 3, Christopher left a voice mail for the Agency, asking to speak with a social worker so he could explain what he had done. On January 7, Dinneny left Christopher a voice mail with information about the Mississippi family court and guardian ad litem. Christopher called the Mississippi child welfare services agency and was told he could not "do anything" himself; contact from the Agency or a letter from the court was required. He called the Mississippi court and was told "it was either a matter of Hawaii

8

or San Diego." He was also told that he would need to fly to California, hire an attorney and pursue custody in California. Christopher went to Kansas to work to earn money to go to San Diego.

On January 17, 2013, Amanda told Venegas she was staying with her boyfriend but refused to provide his name or address. Amanda did not know if the boyfriend had a criminal history, but said "he may have went once for assault or battery." Amanda planned for Aaliyah to live with her in the boyfriend's home.

On January 18, 2013, Christopher left a message for the Agency reporting his lack of success with the Mississippi resources and requesting a return call. On January 22, Christopher told the Agency that he had contacted Mississippi and San Diego; he had been told no one could help him and he should hire an attorney in San Diego; he had attempted to obtain counsel but could not pay a retainer; and he was in Kansas trying to earn money. He could not afford to come to San Diego to obtain custody of Aaliyah and take her back to Mississippi, and he concluded he would have to wait until the Agency detained Aaliyah and then obtain custody.

On January 23, 2013, Venegas made an unannounced visit to Amanda's boyfriend's home. Amanda said her boyfriend was or had been on parole for assault and admitted she was unable to provide Aaliyah a safe environment.

On January 28, 2013, Dr. Hubley reported Amanda had asked him for pain medication the previous week. Amanda refused to continue seeing the pain specialist Dr. Hubley had recommended. Dr. Hubley said Amanda described herself as homeless, and he believed she was incapable of providing a safe environment for Aaliyah.

9

On January 28, 2013, the Agency filed a two-count dependency petition on behalf of Aaliyah, who was nearly seven years old. (Welf. & Inst. Code, § 300, subd. (b).)[5] Both counts alleged Amanda was incapable of providing regular care, and Christopher failed and was unable to protect and supervise Aaliyah.

The first count alleged Amanda had a mental illness. She was "disheveled, agitated, loud and unable to calm herself" and made "random . . . statements." Amanda's physician said Amanda had "psychiatric issues including a history of picking at her skin due to a belief she had parasites and often bringing" samples to the doctor. Aaliyah was afraid of Amanda "due to being yelled at and hit with a plate in the head." Aaliyah "report[ed] the medication [Amanda took] to calm her [did not] work."

The second count alleged Amanda abused narcotics and dangerous drugs (Ritalin, Klonopin, Percocet, morphine, oxycodone hydrochloride, Vicodin and marijuana). On November 29, she tested positive for marijuana. She admitted "taking multiple medications including [Aaliyah]'s medication." Amanda "sought out prescription pain medication from various doctors." She ignored medical advice "to taper off medications," and instead went to emergency rooms to obtain more pain medication. She had erratic mood swings and slept excessively, forcing Aaliyah to find her own food and giving her access to Amanda's medication. The Agency's offers of services were to no avail, as Amanda denied she had a problem.

---

5    Further statutory references are to the Welfare and Institutions Code unless otherwise specified.

On January 28, 2013, Aaliyah was detained in Polinsky Children's Center. Amanda visited frequently, but Aaliyah acted out and had tantrums during the visits. By the end of January, Christopher had not spoken with Aaliyah for a month or two.

On February 1, 2013, the Agency left Christopher a message with the contact information of a new social worker, Dina Delacruz. Christopher returned the call that day and was told that because he lived in Mississippi, proceedings under the Interstate Compact on the Placement of Children (ICPC) (Fam. Code, § 7900 et seq.) might be necessary. Christopher said he was still interested in long-term placement of Aaliyah, although he was comfortable with the aunt having temporary custody. On February 5, Christopher left a message for the Agency stating he had given notice at his job in Kansas because he believed it would be best for him to be home.

On February 6, 2013, Delacruz interviewed Aaliyah. Aaliyah said that when she lived with Amanda, they moved a lot. When asked about Amanda's medication use, Aaliyah said she did not want to talk about it. When asked if she felt safe with Amanda, Aaliyah said she did because Amanda left her with the nonrelative extended family member. When asked where she would like to live, Aaliyah said with Amanda or the nonrelative extended family member or the aunt. When Delacruz asked Aaliyah "about her father, [Aaliyah] stated that she did not have a dad." When Delacruz said she was in contact with Aaliyah's father, Aaliyah referred to him as "Mr. Chris."[6] Aaliyah said Amanda had told her that Christopher was mean to Amanda and wanted to hurt Aaliyah

---

6    Christopher testified that Amanda had instructed Aaliyah to call him "Mr. Chris." Christopher testified that Aaliyah called him "Daddy."

11

and take her from Amanda. Delacruz later testified that Aaliyah continued to say "negative things" about Christopher. Delacruz reported Amanda had "a deep abhorrence of [Christopher's] presence in Aaliyah's life."

On February 7, 2013, Amanda denied she "blacked out" from taking medication, but admitted a "blackout" from eating too much. She said she had stopped taking morphine, had not used any pain medication since November 2012 and was experiencing withdrawal symptoms. Amanda denied that Aaliyah would be unsafe in her care.

On February 7, 2013, Aaliyah was detained with the aunt. Around February 11, Amanda entered the KIVA drug treatment facility.

On February 13, 2013, Christopher left a message for the Agency requesting a call back. On February 19, Delacruz interviewed Christopher. He repeated that he wanted custody of Aaliyah. Delacruz repeated that ICPC proceedings might be required, and asked why he had not come to San Diego to pick up Aaliyah. Christopher said he was not financially able to come to San Diego and retain counsel, but was able to support Aaliyah financially, would obtain therapeutic services to ease her transition to his home and would participate in services. On March 12, Christopher completed a parenting course as the Agency had requested.

On March 22, 2013, the juvenile court struck from count 1 the allegation that Amanda "had a mental illness," leaving the remaining allegations intact. The court entered true findings on the petition and ordered Aaliyah removed from Amanda's custody (§ 361, subd. (c)(1)). The court found that placement with Christopher would be detrimental to Aaliyah and ordered her placed with a relative. The court ordered the

12

Agency to expedite an evaluation of Christopher's home in Mississippi and to make a referral to the child welfare agency in Mississippi for services for Christopher. The court authorized a visit between Aaliyah and Christopher in Mississippi, with the agreement of Aaliyah's counsel.

## THE JURISDICTIONAL FINDING

Section 300, subdivision (b) allows a dependency when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . the inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse." Section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdictional hearing. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1396.) In the juvenile court, the Agency had the burden of proof by a preponderance of the evidence. (*In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318; § 355, subd. (a).) Amanda now has the burden of showing the jurisdictional finding is unsupported by substantial evidence. (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1135.) We view the record in the light most favorable to the court's ruling. (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.)

Amanda had a longstanding history of substance abuse, beginning with marijuana and including prescription medications, but never admitted she had a problem. She also behaved erratically and had "threatened to cause physical harm to anyone who trie[d] to remove [Aaliyah] from her care." Amanda appeared oblivious to the dangers her behavior and drug abuse posed to Aaliyah. Amanda had neglected Aaliyah and hit her in

13

the head with a plate. Amanda was in compliance with the KIVA program and her drug tests had been negative, but she had been in the program for less than six weeks.

The purpose of section 300 "is to provide maximum safety and protection for children who are currently being physically . . . or emotionally abused [or] neglected . . . , and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) A parent's " '[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.) The child need not have been actually harmed for the court to assume jurisdiction. (See *In re James R.* (2009) 176 Cal.App.4th 129, 135.)

Substantial evidence supports the jurisdictional findings.

THE REMOVAL

Before a child can be removed from parental custody, the Agency must prove, by clear and convincing evidence, "[t]here is or would be a substantial danger to [her] physical health, safety, protection, or physical or emotional well-being if [she] were returned home" and removal is the only reasonable means of protecting her physical health. (§ 361, subd. (c)(1).) "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus . . . is on averting harm to the child." (*In re Diamond H.*, *supra*, 82 Cal.App.4th at p. 1136.)

On appeal, Amanda has the burden of showing there is no substantial evidence justifying Aaliyah's removal. (*In re Diamond H.*, *supra*, 82 Cal.App.4th at p. 1135.) " ' "The sufficiency of evidence to establish a given fact, where the law requires proof of the fact to be clear and convincing, is primarily a question for the trial court to determine,

14

and if there is substantial evidence to support its conclusion, the determination is not open to review on appeal." [Citations.]' [Citation.] Thus, on appeal from a judgment required to be based upon clear and convincing evidence, 'the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.' " (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880-881, quoted in *In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581.)

The removal order is amply supported by evidence of Amanda's history of substance abuse and erratic behavior, her insensibility to their effect on Aaliyah, her physical abuse of Aaliyah and her refusal and failure to acknowledge she had a problem. Amanda argues the court failed to consider, as an alternative to removal, placing Aaliyah with her at KIVA.[7] The Agency had attempted less drastic alternatives for months, but Amanda had resisted all assistance until after Aaliyah's detention. As noted above, Amanda's tenure at KIVA was recent. After suffering from neglect and instability with Amanda, Aaliyah was doing well in the aunt's home. Substantial evidence supports the conclusion there would have been "a substantial danger to [Aaliyah's] physical health, safety, protection, or physical or emotional well-being . . . if [she had been] returned" to Amanda and there were no reasonable means of protecting Aaliyah's physical health short of removal. (§ 361, subd. (c)(1).)

---

7    Children were allowed to stay at KIVA. We assume, without deciding, that Amanda would be accorded that privilege and there was space at KIVA for Aaliyah, although there was no evidence on either point.

15

PLACEMENT WITH CHRISTOPHER

"When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300,[8] who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd (a).) This evinces "the [l]egislative preference for placement with that parent . . . ." (*In re Austin P*., *supra*, 118 Cal.App.4th at p. 1132.)

In the juvenile court, detriment must be proven by clear and convincing evidence. (*In re Luke M*. (2003) 107 Cal.App.4th 1412, 1426; *In re Isayah C*. (2004) 118 Cal.App.4th 684, 699-700; *In re John M*. (2006) 141 Cal.App.4th 1564, 1569-1570 (*John M*.).) On appeal, we apply the substantial evidence standard of review, and view the record in the light most favorable to the court's order. (*In re Luke M*., at p. 1426.) Under this deferential standard of review, we conclude there is substantial evidence supporting the finding that placement with Christopher would be detrimental to Aaliyah's "safety, protection, or physical or emotional well-being." (§ 361.2, subd (a).)

---

8    Such a parent is sometimes called a "nonoffending noncustodial parent" (*In re Austin P*. (2004) 118 Cal.App.4th 1124, 1132) or a "noncustodial parent" (*In re V.F.* (2007) 157 Cal.App.4th 962, 965).

In finding detriment, the court noted Christopher had not exercised his visitation rights; two years had elapsed since he had seen Aaliyah; he did not "know anything about her really, her day-to-day needs, her day-to-day activities" and he had not specified what he was doing to obtain custody. The court stated that Christopher recognized that transition to his home would be difficult for Aaliyah and she was not ready to make the transition, and detriment was evident from his "[realization] he is not able at this point in time with all the things that are going on with Aaliyah to take her on, as well as bring her into a home with two other children, with a father she barely knows." The court acknowledged it was not Christopher's fault that Amanda had caused Aaliyah to be alienated from him, but "Aaliyah still ha[d] . . . those thoughts in her, and she need[ed] to be counseled as to that . . . ." The court distinguished *John M.*, noting there was no allegation that John's father failed to protect, while Christopher was an "offending" father in that the true finding included his failure and inability to protect and supervise Aaliyah.

The court did not err in finding detriment. Christopher had been concerned about Amanda's parenting for years, but did not protect Aaliyah. He realized that was a mistake; understood that Aaliyah was probably confused by his absence from her life; and recognized that a transition to his home would distress her. He planned to "do whatever it takes" to ease the transition, including receiving training on how to care for a child with ADHD. By the time of the hearing, Christopher had almost daily supervised telephone conversations with Aaliyah, and planned to begin communicating via Skype. Aaliyah was excited when Christopher called and enjoyed their contact.

17

*John M.* is distinguishable from the instant case. Aaliyah was much younger than teenaged John M. (*John M., supra,* 141 Cal.App.4th at p. 1567.) Unlike John M., Aaliyah had been led to believe that her father wanted to hurt her and take her away from her mother. The fact that Amanda was the cause of Aaliyah's beliefs does not make the beliefs any less real to Aaliyah. Furthermore, Christopher could have made a stronger attempt at rapprochement once the Agency became involved; he did not contact Aaliyah during the two months she lived with the nonrelative extended family member.

Christopher argues the Agency had a duty to make reasonable efforts to avoid placement with a nonparent, but correctly acknowledges section 361.2 contains no such requirement. Moreover, the Agency attempted to resolve this matter without filing a petition, although the Agency's dealings with Christopher were lacking.[9] In this case, however, the Agency's shortcomings do not undermine the detriment finding.

Substantial evidence supports the juvenile court's finding it would have been detrimental to Aaliyah to be placed with Christopher.

---

[9] First, the Agency did not include Christopher in the November 28, 2012, safety plan it made with Amanda. Second, the Agency sometimes was dilatory in returning Christopher's calls. In December, there was a nine-day delay, and the new social worker who returned the call asked Christopher the status of the case and gave him a one-week deadline. Despite his efforts, Christopher received no further communication from the Agency for two weeks. Third, the Agency told him twice, incorrectly, that ICPC proceedings might be required. (*John M., supra,* 141 Cal.App.4th at p. 1575.) Fourth, Christopher called the Mississippi child welfare services agency at the Agency's suggestion, and learned that contact from the Agency or a letter from the court was required. By the time of trial three months later, there was no indication the Agency had contacted the Mississippi agency.

DISPOSITION

The judgment is affirmed.


                                              HUFFMAN, Acting P. J.

WE CONCUR:


HALLER, J.


McDONALD, J.