Filed 2/27/25  In re Athena C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re Athena C. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E084168 |
| Plaintiff and Respondent, | (Super.Ct.No. J300022-23) |
| v. | OPINION |
| M.C. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed in part, vacated in part with directions.

Lelah S. Forrey-Baker, under appointment by the Court of Appeal, for Defendant and Appellant, M.C.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant, R.C.

1

Tom Bunton, County Counsel and Helena Rho, Deputy County Counsel for Plaintiff and Respondent.

The juvenile court sustained allegations against R.C. (Mother) under Welfare and Institutions Code section 300 and removed the two minor children who lived with her but did not place those children with M.C. (Father), a noncustodial parent. (Unlabeled statutory references are to the Welfare and Institutions Code.) Father challenges the sufficiency of the evidence supporting the juvenile court's determination not to place the children with him under section 361.2, subdivision (a) (§ 361.2(a)). Mother and Father also argue that the court and San Bernardino County Children and Family Services (CFS) failed to comply with the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related state law. We agree with the parents concerning the ICWA finding and accordingly vacate that finding. We otherwise affirm.

BACKGROUND

I.    *Family background*

Mother and Father are the parents of four children: Athena C. (born in May 2008), Sean C. (born in March 2022), P.C. (female, birthdate unknown), and Michael C. (birthdate unknown). (We refer to Athena and Sean collectively as "the children" because P.C. and Michael are not involved in this dependency proceeding.) The parents were married for 15 years and divorced in Colorado in 2022. The family had a dependency history in Colorado with substantiated allegations against both parents between 2017 and 2020.

2

When the parents divorced, a Colorado court ordered custody of the four children split between the parents, awarding Father primary custody of P.C. and Michael and Mother primary custody of Athena and Sean. The court reasoned that ordering primary custody of Athena to Mother was supported because Athena was "aligned with" Mother and Athena did not have a good relationship with Father. The court awarded Mother primary custody of Sean because he was still breastfeeding.

Sometime in late 2022, Mother moved to California with Athena and Sean, even though the Colorado court had twice denied Mother's request to make that move and the parents had not otherwise agreed to the move. In November 2022, the Colorado court granted Father's request to move to Texas with Michael and P.C. In April 2023, the Colorado court appointed a guardian ad litem for Mother, finding that "she is nonetheless mentally impaired in these proceedings such that she is incapable of effectively participating." In July 2023, the Colorado court ordered Mother to undergo a mental health evaluation by a licensed mental health provider. Mother had not complied with that order by October 2023.

In December 2023, a Colorado court issued restraining orders against Mother, protecting Father and the paternal grandmother, Cynthia C. In addition, a Colorado court had previously issued a restraining order against Mother in 2021 to protect a social worker involved in a dependency proceeding concerning the family, because Mother harassed the social worker and her family.

3

II.     *Initial investigation and detention*

The family came to the attention of CFS in February 2024, when the agency received several reports about Mother suffering from mental illness. Athena called 911 because Mother was at her high school jumping on a car while holding Sean, who was not quite two years old. Mother demanded to speak with the Department of Homeland Security and Immigrations and Customs Enforcement, telling law enforcement officers that her embryos were being stolen and that illegal aliens were impersonating citizens. Mother claimed that her children had been abducted, and she did not want to leave the school until her children who lived in Texas were returned. Athena told law enforcement that Mother was bipolar, schizophrenic, and depressed but had not taken any medication for the past three years. Athena believed that Mother was having a manic episode.

Law enforcement transported Mother to a hospital, where she was placed on a section 5150 hold. A social worker met with Athena and Sean at the sheriff's station. Athena told the social worker that Mother suffered from occasional manic episodes but did not use alcohol or drugs, with the exception of marijuana. Athena had not spoken with Father in two years and said that they did not have a good relationship. CFS took Athena and Sean into temporary custody because of exigent circumstances.

Father spoke with a social worker via telephone later in the day and explained the parents' custodial arrangement for their four children. Father said that he had recently learned from a maternal aunt that Mother was bipolar and that she self-medicated. The social worker also interviewed the maternal aunt, Rachell A., who reported that Mother

4

was diagnosed with bipolar disorder when she was 16 years old. Father informed the social worker about the restraining orders protecting him and his family from Mother, which he said were obtained because she harassed them, including by calling Texas law enforcement to report that Father abducted the children. Father admitted that he had been convicted of misdemeanor domestic violence in Colorado, sentenced to one year of probation, and ordered to take a domestic violence class.

Father said that he had recently called CFS (which CFS confirmed) and law enforcement in California to report concerns about Mother. Father reported that Mother was making bizarre statements, using "harder drugs" than marijuana, and giving marijuana to 15-year-old Athena. According to Father, Mother had previously used methamphetamine. In addition, Father told the social worker that a relative who visited Mother's home on Thanksgiving said that the house "was in shambles with dog feces everywhere."

A social worker interviewed Athena about the information reported by Father. Athena admitted that she had smoked marijuana but denied that she had done so with Mother's knowledge or that Mother had given her marijuana. Athena described the house as clean and explained that the family had new puppies who had accidents, which the family cleaned up immediately. Athena believed that Mother's mental health issues had been triggered by not having Athena's other two siblings in her custody. Athena reported feeling safe with Mother and did not feel that she or Sean was at risk of harm

during Mother's "episodes." Athena wanted to live with Mother when Mother was released from the hospital.

With respect to placement, Father wanted the children placed with either Mother's cousin, Arthur, or one of two maternal aunts, Rachell or Roseann. Mother did not have an issue with placing the children with Arthur but did not want them placed with Rachell, whom Mother described as "an abuser" who "burned her own child before." Father and Rachell denied the allegation, and Rachell reported that Mother had a history of harassing family and making false allegations. Rachell told CFS that she and her husband were willing to care for Athena and Sean, but Rachell wanted minimal contact with Mother because of Mother's mental health issues.

Mother wanted someone named "Francis," whom she identified as a godparent, to be considered for placement. Later in the proceeding, Mother said that her cousin "Frances" was her safety network.

Athena wanted to be placed in the same home as Sean and preferred to stay in Barstow, California, where she already attended high school, had friends, and participated on the track team. Father believed that it would be better for Athena and Sean to be placed with family, even though Athena would have to attend a different school, where he believed that she would make new friends and also participate on the track team. Athena did not believe Mother's accusation against Rachell and instead believed that the accusation stemmed from Mother's mental health issues.

6

CFS placed Athena and Sean with a foster family in Barstow. An employee of the foster family agency subsequently accompanied Athena to her home to make arrangements for the family's dogs. The employee described the home as having a "very foul odor" with animal excrement throughout the house in a greater quantity than would have accumulated during Mother's hospitalization. In addition, the employee noted that there was marijuana located on countertops and easily accessible to Athena.

III.    *The allegations and the initial hearing*

CFS filed a dependency petition with allegations under subdivision (b)(1) of section 300 (§ 300(b)(1)) that Mother suffered from an untreated mental illness and had substance abuse issues, Mother's home is unsafe or unhealthy because of accumulated animal excrement, and Father failed to protect the children. CFS additionally alleged under subdivision (g) of section 300 that Mother left the children without any provision for care when she was hospitalized. The court detained the children, who remained with the local foster family. The court ordered weekly two-hour supervised visits for both parents.

IV.    *Jurisdiction and disposition*

The court held a contested jurisdiction and disposition hearing in June 2024. For the hearing, CFS filed numerous reports, including a jurisdiction and disposition report in March and additional information reports in April and June.

A social worker interviewed Mother for the first time in late February 2024. Mother denied the allegations and indicated that she believed that she was being punished

7

by CFS for reporting crimes committed by school staff.  Mother said that she suffers from depression, autism, attention-deficit/hyperactivity disorder, and posttraumatic stress disorder (PTSD).  She reported that she was taking her prescribed medication when she was hospitalized.  The medical records from the hospital indicate that Mother was initially diagnosed with bipolar affective disorder and acute psychosis.  Mother admitted that she also smoked marijuana twice daily to treat her mental health issues, and she did test positive for marijuana.

By April 2024, Mother had stopped taking any prescribed medication but continued smoking marijuana to self-medicate, which remained consistent through June.  CFS reported that Mother frequently and sometimes daily called CFS, accusing CFS of violating her rights and attempting to abduct her children.  Mother also called Athena's school daily, asking for information about Athena's well-being.  In June, CFS reported that Mother sometimes displayed "extreme paranoia."  CFS asked the foster family agency to text Mother every morning with an update about the children, which the agency agreed to do as often as possible.

Mother visited the children weekly.  During one visit, Mother called law enforcement to report that the children had been kidnapped.

Father spoke with CFS several times between the detention hearing and the jurisdiction and disposition hearing.  He consistently reported that he was unable to take custody of Athena and Sean while caring for his other two children, because he did not have the financial means or support.  Father also explained that he was not "'equipped'"

8

to care for a toddler and that Athena did not want to live with him anyway because he was too strict. In addition, Father also expressed concern that Mother would harass him if Athena and Sean moved in with him.

In March 2024, Father indicated that he believed that it would be best if Sean was placed with Rachell and Athena remained in foster care. One month later, Father said that it would be best if both Athena and Sean were placed with Rachell, given that she lived in California. Father explained that placement in California would afford Mother the best opportunity to reunify with the children, which Father hoped would happen. A few days before the jurisdiction and disposition hearing in June, Father expressed hope that the case against him would be dismissed, so that he could grant legal guardianship of both Athena and Sean to Rachell.

In the March 2024 jurisdiction and disposition report, CFS reported that Rachell was willing to have only Sean placed with her. During a conversation with a social worker the following month, Rachell said that she was interested in having both Athena and Sean placed with her and would like to be considered as a permanent placement option if it was possible for CFS not to disclose the placement to Mother. Rachell worried that Mother would "come and disrupt her home with threats and harassment," given that Mother knew where she lived. Rachell explained that Mother had recently shown up at Rachell's house, banging on the windows and doors and yelling accusations about Rachell being a terrorist who stole Mother's husband. Rachell did not open the door, because she was afraid and worried about the safety of her own two children. In

9

addition, Mother had harassed Rachell via text and on social media, where Mother made unspecified false accusations and posted images of Rachell's house. In April 2024, Rachell reported that she intended to apply for a restraining order against Mother, but she never reported following through with that intention.

In April 2024, CFS took the position that it was not in the children's best interest to be placed with Rachell. CFS opined that Rachell's ability "to provide a safe, secure, and stable environment for the children is questionable based on [Rachell's] statements of not being able to protect herself, nor her family from [Mother], and [Rachell] is unable to ensure that [Mother] will not have access to the children at her home due to the harassment she has experienced from [Mother]."

A social worker spoke with Rachell again in June 2024, one week before the jurisdiction and disposition hearing. Rachell again expressed concern "that if she has the children placed in her home, [Mother] might start to cause issues, which [Rachell] [did] not want to put her family at risk of experiencing." Rachell was "willing to be a permanent plan for the children if later in the case the children need a permanent placement," but Rachell wanted to wait to see if Mother was able to reunify with the children.

In the months preceding the jurisdiction and disposition hearing, CFS consistently reported that both children were doing well in their placement.

Both Mother and Rachell testified at the jurisdiction and disposition hearing in June 2024, and Father appeared telephonically. Mother testified that she had been

diagnosed with depression and PTSD and was prescribed medication that she was not taking, because she did not like the way that it made her feel. To treat her mental health issues, Mother used CBD and also used marijuana two to four times daily, which she said had been prescribed by doctors. Mother denied ever leaving marijuana on a countertop or table. Mother did not believe that Athena or Sean should be placed with Rachell, because Rachell was emotionally and physically abusive and might not comply with court orders.

After Mother testified, the court asked Father's counsel if Father still planned to place the children with Rachell despite her recent statements that she did not want the children placed with her, because of safety concerns. Father's counsel represented that she believed that there was a misunderstanding, because Rachell communicated to counsel that she wanted the children placed with her. Father's counsel also verified that Father remained unable to take custody of the children because he lacked the necessary space. Counsel remarked that the parents' other two children had been living for some time with the paternal grandparents but were currently living with Father. The court stated that it wanted Rachell to testify to clarify how she actually felt about placement, and counsel proffered that Rachell was available to appear telephonically. While the clerk was getting Rachell on the phone, the court ordered Father not to text Rachell to "give her a hint of what we're doing."

Rachell testified that she felt comfortable having Athena and Sean placed with her immediately despite her previous concern that she would not be able to facilitate weekly

11

visits with Mother and that Mother would harass her.  Rachell discussed the incident in which Mother arrived unannounced at her house in February 2024, explaining that she had to call law enforcement because Mother was yelling and acting erratically.  Rachell said that if the children were placed with her, then she would not hesitate to call law enforcement if Mother arrived unannounced and demanded to see the children.  Rachell believed that she would be able to comply with any visitation order but wanted visitation to occur somewhere other than her house and with professional supervision.  On questioning by the court, Rachell clarified that because of the distance between the homes she would not be able to facilitate weekly visits between Mother and the children, even if scheduled at a halfway point.

After Rachell testified, the court held an off-the-record chambers conference in which it gave a tentative ruling about placement, which the court then described on-the-record.  The court indicated that it was not inclined to place the children with Rachell despite the statutory preference for placement with relatives under section 361.3, because the placement would be detrimental to the children.  The court reasoned that Rachell would not be able to facilitate visitation, which would affect Mother's ability to reunify.  The court also believed that placing Athena with Rachell would be detrimental because of an "outburst" that Athena had when the court questioned Rachell about her ability to accommodate court-ordered visits.  The court described what happened as Athena "wailing in court" and then having to be consoled.  The court also indicated that because of the detriment finding under section 361.3, placing the children with Father under

12

section 361.2 would also be detrimental, given Father's plan to have the children reside with Rachell if Father obtained custody. The court reasoned that Father's chosen plan was not appropriate "because it would be detrimental based on the child's reaction here in open court."

After the court gave its tentative ruling, the social worker who authored the jurisdiction and disposition report also testified. She had last spoken with Rachell several days earlier, at which point Rachell expressed concern about having Athena and Sean placed with her. Rachell worried "that a restraining order would not prevent Mom from coming to the home and gain[ing] access to the children." The social worker confirmed that Rachell would not be able to facilitate weekly visits. The social worker believed that it would be detrimental to place the children with Rachell because Mother had previously gone to Rachell's house and harassed Rachell.

The juvenile court sustained the section 300(b)(1) allegations against Mother and dismissed the remaining allegation against her. The court also dismissed the section 300(b)(1) allegation against Father. The court removed Athena and Sean from Mother's custody and ordered reunification services for both parents. The court ordered once weekly two hour supervised visits and authorized CFS to increase the frequency and duration of the visits.

With respect to the children's placement, the court first considered whether placement with Rachell would be appropriate under section 361.3. Consistent with the tentative ruling, the court found that the relative placement would be detrimental to

13

Athena in light of Athena's emotional outburst and Rachell's inability to facilitate visits. The court then considered whether to place the children with Father under section 361.2(a), acknowledging that it was statutorily required to place the children with him unless the court found by clear and convincing evidence that the placement would be detrimental to the children. As expressed in the tentative ruling, the court found that placement with Father would be detrimental because his plan to have the children reside with Rachell would negatively affect Athena's relationship with Mother. The court explained that it would be detrimental to Athena to lose the bond with Mother, given her strong attachment to Mother.[1] The court found the children's current placement to be appropriate.

After the court found that placement with Father would be detrimental to the children because of his plan to have them reside with Rachell, the court noted: "And make no mistake, when the time comes and Dad has a place and he has a space, the Court—I mean, I don't want to paint myself in a corner here, but I just don't see how I don't place with him, unless there's a detriment by clear and convincing evidence." The court did not believe that its comments about possibly placing the children with Father in

---

[1]    As Father correctly points out, the minute orders incorrectly state that the court removed the children from both parents because it found by clear and convincing evidence that there is substantial danger to the physical health, safety, protection, or emotional well-being of the children. The minute order's language tracks the language of section 361, subdivision (c)(1), for removing a child from a custodial parent. That provision does not apply to noncustodial parents. (*In re Adam H.* (2019) 43 Cal.App.5th 27, 32.)

14

the future contradicted the court's detriment finding concerning Father's plan to have the children reside with Rachell, "because the dad is a parent."

DISCUSSION

I.    *Section 361.2(a)*

Father contends that the juvenile court committed prejudicial legal error in analyzing his request for placement under section 361.2(a) and that the evidence is insufficient to support the juvenile court's denial of that request.  We disagree.

Section 361.2(a) provides that if a child is removed at disposition, the juvenile "court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child." (§ 361.2(a).)  "If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (*Ibid.*)  A finding of detriment under section 361.2(a) "must be made by clear and convincing evidence." (*In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1829; *In re M.C.* (2023) 88 Cal.App.5th 137, 152-153 (*M.C.*).)

We review the juvenile court's finding for substantial evidence, taking into account the level of confidence that the clear and convincing evidence standard demands. (*M.C.*, *supra*, 88 Cal.App.5th at pp. 152-153; see also *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)  In analyzing the sufficiency of the evidence, we do not reweigh

15

the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

Father argues that the juvenile court committed legal error by considering whether the children should be placed with the maternal aunt under section 361.3 before it considered whether placement of the children with Father would be detrimental under section 361.2(a). The argument fails because Father does not explain how the juvenile court's purported error prejudiced him. "[I]t is not sufficient to show error; the appellant must also demonstrate that the error was prejudicial." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 591.) Thus, Father bears the burden on appeal of demonstrating that "there is a reasonable probability that a result more favorable to [him] would have been reached in the absence of error." (*Ibid.*) By not making any argument about how the claimed error prejudiced him, Father has failed to carry that burden.

Moreover, it is difficult to see how there could be a reasonable probability that Father would have achieved a better result absent the claimed error. If the court had conducted its analysis in the order that Father claims would have been correct, the court would have evaluated whether placing the children with Father would be detrimental to the children under section 361.2(a), and in conducting that analysis the court would have evaluated whether Father's plan for the children's care (i.e., having them reside with the maternal aunt) was appropriate. There is no reason to think that the result of any of that analysis would have been more favorable to Father.

Father's substantial evidence challenge fails as well. Father indicated unequivocally throughout the proceeding that if the children were placed with him, then he would be unable to take physical custody of them. He instead planned to place the children with Rachell and possibly to make her their legal guardian. Under these circumstances, the relevant inquiry under section 361.2(a) is whether residing with Rachell "would be detrimental to the safety, protection, or physical or emotional well-being of the" children. (§ 361.2(a).)

The record contains substantial evidence to support a finding by clear and convincing evidence that it would be detrimental for the children to reside with Rachell. Rachell consistently expressed concern about her ability to protect the children from Mother if they were placed with her, and at times she expressed willingness to take the children only if Mother were not informed of the placement. Rachell had recently called law enforcement when Mother showed up at her house unannounced, yelling, acting erratically, and banging on windows and doors. Rachell feared for the safety of her own children during the incident. The juvenile court was free to disbelieve Rachell's testimony that she believed that she could protect the children from Mother, given that Rachell had repeatedly expressed concern about being able to protect the children from Mother if they were placed with her. Given the ample evidence that the children would not be safe from Mother in Rachell's care, the juvenile court could reasonably infer that Father's plan to have the children reside with Rachell would be detrimental.

17

In addition, Athena had what the court described as a spontaneous emotional outburst when the court questioned Rachell about her ability to facilitate weekly visits with Mother, which Rachell could not do. In light of the evidence concerning the strength of Athena's relationship with Mother, the juvenile court could reasonably infer that Athena's evident emotional distress showed that Father's plan to place Athena with Rachell would be detrimental to Athena's emotional well-being.

Moreover, Sean was only two years old and had lived with Athena his entire life. Athena wanted to be placed in the same home as Sean. The juvenile court could reasonably infer from those facts that Athena and Sean shared a strong sibling bond and that it would consequently be detrimental to their emotional well-being if they were to be placed in different homes. (See §§ 361.2, subd. (j) [when ordering removal under § 361 "the court shall consider . . . the nature of the relationship between the child and their siblings, the appropriateness of developing or maintaining the sibling relationships pursuant to Section 16002, and the impact of the sibling relationships on the child's placement"], 16002, subd. (a)(1) [legislative preference to place siblings together unless such placement would be detrimental to one of the siblings].)

The cases that Father relies on are distinguishable. None of them involves a situation in which there was substantial evidence that placement with the noncustodial parent would be detrimental to the children's safety. (See *In re C.M.* (2014) 232 Cal.App.4th 1394, 1402-1404; *In re John M.* (2006) 141 Cal.App.4th 1564, 1570-1571.)

We also reject Father's argument that the court's remark that it might place the children with him in the future contradicts the court's determination that placement with Rachell would be detrimental because of the distance that Rachell lived from Mother and the effect that would have on visitation. The court said only that, if in the future Father had room for the children to reside with him rather than with a relative, the court would be inclined to place them with him "unless there's a detriment by clear and convincing evidence." The court made no finding that such a placement would not be detrimental, so there was no contradiction. Moreover, there is substantial evidence that Rachell lacked capacity to protect the children, but there is no such evidence that Father would also lack such capacity.

For all of the foregoing reasons, we conclude that substantial evidence supports the juvenile court's determination that placement of Athena and Sean with Father would be detrimental to the children under section 361.2(a).

II.     *ICWA*

Both parents argue that CFS prejudicially erred by failing to ask certain extended family members about the potential Indian ancestry of Athena and Sean.[2] We agree.

A.     *Relevant proceedings*

In the dependency petitions filed in February 2024, a social worker filled out Judicial Council form ICWA-010(A) and indicated that he questioned both parents in

---

[2]     Because ICWA uses the term "Indian," we use it as well "to reflect the statutory language." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125, fn. 1 (*Dezi C.*).) No disrespect is intended.

19

mid-February 2024 and neither gave him reason to believe that Athena or Sean may be Indian children. Both parents attended the detention hearing the following day. Before the hearing, Mother filled out a CFS Family Find and ICWA Inquiry form (family find form) and a Judicial Council form ICWA-020. In both forms, Mother indicated that she and the children may be members of the Alpha Omega tribe. In the family find form, Mother listed two relatives as familial contacts: Francis Arthur, whom Mother identified as the children's uncle, and Francis N., whom Mother identified as the children's godmother. Mother provided the telephone numbers for both of those relatives.

At the detention hearing, Mother's counsel indicated that Mother wanted her cousin Francis Arthur Go to be considered for placement, so the court ordered CFS to assess them. In addition, the court asked Mother about the Indian ancestry disclosure that she made in the family find form and the ICWA-020. Mother stated that she and the children were members of the Alpha Omega tribe since January 2022. She said that the tribe was federally recognized and located in California. Father told the court that there was no Indian ancestry in his family or Mother's family. Asked about Mother's statement that the children were enrolled in the Alpha Omega tribe, Father remarked, "I don't think that's true." The court ordered CFS to follow up on Mother's claims of Indian ancestry and ordered Mother to provide CFS the paperwork concerning her tribal heritage.

In the jurisdiction and disposition report, the social worker indicated that he spoke with Father, Athena, and the maternal aunt, Rachell, and all denied any Indian heritage.

20

Rachell said that there was no Indian ancestry on Mother's side of the family. Mother told the social worker that she was a member of the "'Alpha Omega Tribe'" and later told the social worker that her tribe was named "'Dust Bunny Animal Sanctuary'" from Newberry Springs and that it was of Saudi Arabian descent. The social worker confirmed with CFS's ICWA department that neither tribe is federally recognized. The report recommended finding that ICWA does not apply to the children.

Father identified the paternal grandmother as his support network. The December 2023 restraining order protecting the paternal grandmother from Mother indicated that she lived and worked in Texas, and the order identified her home and work addresses.

At the contested jurisdiction and disposition hearing, the juvenile court adopted CFS's recommended finding that ICWA does not apply but added the qualification "at this time."

B.     *Legal framework*

To be an Indian child within the meaning of ICWA, a child must be either (1) a member or citizen of a federally recognized Indian tribe, or (2) eligible for membership or citizenship in such a tribe and the biological child of a member or citizen. (25 U.S.C. § 1903(4), (8); § 224.1, subds. (a)(4), (b)(1); *In re Jonathon S.* (2005) 129 Cal.App.4th 334, 338.) The child welfare department and the juvenile court have an "affirmative and continuing duty to inquire" whether a child in a dependency proceeding "is or may be an

21

Indian child." (§ 224.2, subd. (a).)[3] "The duty to inquire consists of two phases—the duty of initial inquiry and the duty of further inquiry." (*In re Ricky R.* (2022) 82 Cal.App.5th 671, 678 (*Ricky R.*), disapproved on another ground by *Dezi C., supra*, 16 Cal.5th at p. 1152, fn. 18.) This case involves only the duty of initial inquiry.

"The duty of initial inquiry applies in every dependency proceeding." (*Ricky R.*, *supra*, 82 Cal.App.5th at p. 678.) The child welfare department's duty to inquire begins "when first contacted regarding a child." (§ 224.2, subd. (b)(1).) The department must ask the "party reporting child abuse or neglect whether the party has any information that the child may be an Indian child," and the department must also ask the child and the child's family members, including extended family members, upon first contact with those individuals. (*Ibid.*) In addition, if the child is taken into the department's temporary custody under section 306, "or if they were initially taken into protective custody pursuant to a warrant described in Section 340," then the department must ask "the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b)(2).)[4] Extended family

---

[3] The Legislature recently enacted Assembly Bill No. 81 (2023-2024 Reg. Sess.) (Assembly Bill 81), which amended section 224.2 effective September 27, 2024. (Stats. 2024, ch. 656, § 3.) We quote that version of the statute.

[4] Before Assembly Bill 81 was enacted, section 224.2, subdivision (b), stated that the child welfare department had a duty to inquire of extended family members (and others) if the child was placed into the department's temporary custody under section 306, and the statute did not expressly refer to protective custody under section 340. (Former § 224.2, subd. (b), enacted by Stats. 2018, ch. 833, § 5.) Courts interpreting that

*[footnote continued on next page]*

members include adults who are the child's stepparents, grandparents, siblings, brothers- or sisters-in-law, aunts, uncles, nieces, nephews, and first or second cousins. (§ 224.1, subd. (c)(1).)

Juvenile courts must conduct their own initial inquiry as well. "Federal regulations require state courts to ask each participant 'at the commencement' of a child custody proceeding 'whether the participant knows or has reason to know that the child is an Indian child.'" (*Ricky R.*, *supra*, 82 Cal.App.5th at pp. 678-679, quoting 25 C.F.R. § 23.107(a) (2022).) Similarly, state law requires the court to pursue an ICWA inquiry at the first hearing on a dependency petition (or at the first court appearance of a party or "other interested person[]," if the party or other interested person was not present at the first hearing). (§ 224.2, subd. (c).)

---

version of section 224.2, subdivision (b), split on whether the duty to inquire of extended family members was triggered if the department took the child into custody under section 340 pursuant to a protective custody warrant. (See *In re D.M.* (2024) 101 Cal.App.5th 1016, 1026-1046 [describing the split and evaluating the arguments on both sides], review granted July 24, 2024, S285537.) Our Supreme Court is reviewing the issue. (*In re Ja.O.* (2023) 310 Cal.Rptr.3d 728.)

But Assembly Bill 81 recently clarified that aspect of the law by requiring child welfare departments to inquire of extended family members regardless of whether the child was taken into temporary custody under section 306 or protective custody under section 340. (E.g., Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill 81 (2023-2024 Reg. Sess.) as amended Aug. 19, 2024, p. 5 [the bill "[c]larifies the timing, duration, and scope of a county department's, and a court's, duty to inquire whether a child is or may be an Indian child"].) That clarification applies to ICWA inquiries and findings that predated the enactment of Assembly Bill 81. (See *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 922 ["A statute that merely clarifies, rather than changes, existing law is properly applied to transactions predating its enactment"].)

The juvenile court may find that ICWA does not apply to the proceedings if it finds "that an agency's inquiry and due diligence were 'proper and adequate,' and the resulting record provided no reason to know the child is an Indian child." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1134.) The "court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*Id.* at p. 1141) "'"On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case. However, the less developed the record, the more limited that discretion necessarily becomes."'" [Citations.] [¶] If, upon review, a juvenile court's findings that an inquiry was adequate and proper and ICWA does not apply are found to be supported by sufficient evidence and record documentation as required by California law [citation], there is no error and conditional reversal would not be warranted even if the agency did not inquire of everyone who has an interest in the child. On the other hand, if the inquiry is inadequate, conditional reversal [of an order terminating parental rights] is required so the agency can cure the error and thereby safeguard the rights of tribes, parents, and the child." (*Ibid.*) In an appeal from disposition, however, ICWA inquiry error does not require reversal of the dispositional findings and orders other than the ICWA finding itself. (*In re Dominick D.* (2022) 82 Cal.App.5th 560, 567 (*Dominick D.*); see also *Dezi C.*, at p. 1169, fn. 5 (dis. opn. of Groban, J.).)

24

C.     *Analysis*

The parents argue that CFS failed to discharge its duty of initial inquiry under section 224.2, subdivision (b), because the agency did not inquire of the paternal grandmother and Mother's cousin, Francis.  We agree with respect to the maternal grandmother.  But Mother's cousin is not the first or second cousin of Athena and Sean. (See Merriam-Webster's Dict. Online (2025) < https://www.merriam-webster.com/dictionary/second%20cousin > [as of Feb. 24, 2025] [defining second cousin as "the child of one's parent's first cousin"].)  Mother's cousin Francis thus is not an extended family member under the statutory definition.  (§ 224.1, subd. (c)(1).)

The paternal grandmother, however, is an extended family member.  (§ 224.1, subd. (c)(1).)  Father identified the paternal grandmother as his support network. Moreover, the paternal grandmother's residential and work addresses are contained in the December 2023 restraining order.  But there is no evidence that CFS questioned Father about the paternal grandmother or asked for her telephone number, and there is no evidence that CFS inquired of the paternal grandmother through the available contact information about possible Indian ancestry.

For all of these reasons, the record does not contain sufficient evidence to support the court's implied finding that CFS conducted an adequate and proper ICWA inquiry. We accordingly vacate the finding that ICWA does not apply, but we otherwise affirm. (*Dominick D.*, *supra*, 82 Cal.App.5th at p. 567.)  We direct the juvenile court on remand to order CFS to comply with its inquiry and (if applicable) notice obligations under

25

ICWA and related California law.[5] (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141; *Dominick D.*, at pp. 567-568.)

## DISPOSITION

The finding that ICWA does not apply is vacated. The juvenile court is directed to order CFS to comply with its inquiry and (if applicable) notice obligations under ICWA and related California law. In all other respects, the dispositional findings and orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

MILLER
Acting P. J.

CODRINGTON
J.

---

[5] We note that the record contains information about other extended family members whom CFS should ask about Indian ancestry. (§ 224.1, subd. (c)(1).) Father initially identified another maternal aunt, Roseann, as a possible placement option. The record does not contain Roseann's contact information, and there is no other mention of Roseann in the record. In addition, Mother identified Francis Arthur as the children's uncle. The record contains no information about whether that is the same person who is otherwise identified as a maternal cousin. But CFS should inquire about the relationship and contact Francis Arthur if appropriate. Moreover, at the jurisdiction and disposition hearing, Father's counsel represented that P.C. and Michael had recently lived with the paternal grandparents, not just the paternal grandmother, so CFS should inquire of the paternal grandfather as well.