Filed 12/22/25  In re A.H. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re A.H. et al., Persons Coming Under the Juvenile Court Law. | B343091 |
| _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 24CCJP03469 |
| Plaintiff and Respondent, | |
| v. | |
| J.H., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Affirmed.

Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Courtney Fisher, Deputy County Counsel, for Plaintiff and Respondent.

_____

The juvenile court ordered two young children removed from their parents' custody. Only the father appeals, arguing the Los Angeles County Department of Children and Family Services failed to prove by clear and convincing evidence that allowing the children to relocate with him to Wisconsin "would not be a reasonable alternative to the last resort of removing the children from father's custody." We affirm. Undesignated statutory citations refer to the Welfare and Institutions Code.

## I

The children in this case are A.H. (born April 2019) and M.H. (born May 2021).

The Department received its first referral about A.H. and M.H. in July 2024. According to the caller, the children's mother and A.H. have autism diagnoses and receive welfare benefits. The mother is divorced from the children's father, who lived in Wisconsin. The mother and children were living with relatives, but she planned to move out to her own place. The caller was concerned for the children's safety because the mother would hit both children on the head and face and curse at them when she became upset. This referral was deemed "inconclusive."

In October 2024, the Department received a referral alleging A.H. had come to school with a "fresh" looking black eye. At first, A.H. said a fall caused his black eye, but after more questioning, A.H. said "my mom told me I was not allowed to tell anyone so I just fell."

2

Within thirty minutes of receiving the referral, a Department social worker went to A.H.'s school to investigate. The social worker interviewed A.H., who knew the social worker had come because of his black eye. When the social worker asked what happened to his eye, A.H. again said "oh I fell." But after the social worker questioned him more, A.H. admitted "don't tell my mother that [I] said it, she hit me with the phone." A.H. said he was "not sure" why his mother hit him but also said his mother "smacks" him if he does not behave.

Later that same day, the social worker interviewed the mother. The mother appeared "extremely nervous" and denied hitting A.H., saying he fell from the couch to the trampoline and hit his eye on the TV stand. The mother also said her children are extremely active and often fall and hit themselves. She stated she did not use any objects to discipline her children and denied leaving marks or bruises on them.

The social worker then visited the family's home, where she spoke to the father. He insisted on their conversation taking place a block away from the home because he was worried the mother would hear. The social worker did not believe the father was being honest because he was constantly looking back towards the house and still believed the mother might somehow overhear their conversation.

Eventually, the father told the social worker he had come from Wisconsin to stay at the mother's home because he was worried about their children. The father became emotional and said the mother forced him to sign divorce papers giving her full custody of their children. He claimed to not understand what he was doing when he signed them and that he loved his children.

3

The father also said that during their relationship and marriage, the mother physically assaulted him, but no one would believe him if he said anything. He said he had recorded many videos of the mother yelling at the children and cursing, but he was scared to share the videos because the mother would know he was showing them. The father showed the videos to the social worker, but refused to send them to her because he was scared of the mother. In one video, the mother was coaching A.H. on what to say at school about falling and hitting his eye, as she put on his shoes.

In another video, the mother was lying on the ground while talking and yelling at the children. The father said "she does random stuff like that." He has encouraged the mother to get help for her mental health, but she has not listened to him. The family's sole source of income to pay for rent and living expenses was from welfare benefits for the children. The father said he had health issues from a car accident and had been unable to find work since he moved from Wisconsin. He depended on the mother for shelter and transportation.

The father's family lives in Wisconsin and he said he was willing to take the children to Wisconsin if necessary. However, he also noted he has no custody rights since signing the divorce settlement.

When the social worker encouraged the father to report domestic violence to law enforcement, the father expressed fear. In the words of the Department's report: "It appears [that] the father claimed he is here to protect [the] children, but he is unable to protect them when mother gets upset and loud."

While she was at the family's home, the social worker also assessed M.H., who appeared to be healthy and well-groomed.

4

There were no marks or bruises on M.H.'s body.  M.H. was too young to say anything meaningful to the social worker.

Later that same day, the social worker called the children's maternal grandmother Gloria A.  Gloria A. said the mother has used physical force on the children before.  She also said she would be willing to help take care of the children if necessary.

The social worker did not believe she could leave the children alone with the parents and devised a 7-day safety plan, according to which the children would stay with Gloria A.  The parents agreed to the safety plan.  That night, Gloria A. picked up the children.

When the social worker checked in with Gloria A. a few days later, she learned both children had diaper rashes, the mother had ignored Gloria A.'s request for more diapers and the children's shoes, and that neither parent called about the children over the weekend.  Gloria A. also mentioned A.H. admitted the mother hit him with her phone because he and M.H would not go to sleep, which made her angry.

As for the father, Gloria A. said he came to live with the mother because of "her financial stability and housing situation." She also said she was worried he might drive recklessly with the children in the car.

The Department's investigation continued with a call to Emily A., the children's maternal aunt.  Emily A. told the social worker the history of the parents' tumultuous relationship.  They met online and after two in-person meetings, the mother moved to Wisconsin to be with the father in June 2018.  Then she became pregnant with A.H. and she married the father shortly after A.H.'s birth.

At first, the mother and father lived alone, but then the father's parents and siblings moved in with them. The mother had difficulty adjusting to this change and invited Emily A. to visit. Emily A. observed conflict between the mother and father. After one of their arguments, the mother decided to move back to California with the children in August 2021. However, after she moved, the parents reconciled and the father would buy plane tickets for the mother to visit him in Chicago. Nevertheless, the mother eventually filed for divorce.

At some point after moving back, the mother and the children lived with Emily A. Emily A. observed multiple incidents of the mother using physical force on the children. For instance, the mother hit A.H. multiple times while they were waiting in line for a Monster Jam show in January 2024. Emily A. said the mother would hit the children when she is frustrated with them or wants to get away from them.

Emily A. shared some photos from June 2024 of the children's injuries. One photo showed A.H. with a bruise on his thigh and calf. A.H. told Emily A. that the mother had dragged him at the mall when no other relatives were present. In another photo, M.H. had a scratch on his nose from the mother hitting him. A third photo showed a bruise on M.H.'s back. A.H. said that the bruise was caused by the mother pulling M.H. down from the top of the bunk bed.

Regarding the father, Emily A. reported he had "emotional issues," such as crying and expressing feelings of being disliked. Emily A. described the father as weak and unable to protect the children. Like Gloria A., Emily A. believed the father's relationship with the mother was for his own financial gain,

because he did not contribute anything and relied on the mother's resources.

After speaking with Emily A., the social worker received the report from a forensic medical exam of A.H. When the nurse conducting the exam asked A.H. why he had come, he replied "my mom threw a phone at me. Do you see the blue mark?" The nurse noted A.H.'s injury was consistent with his description of what happened.

Based on this information, the Department applied for and received a removal order from the juvenile court about a week after the October 2024 referral call.

## II

In November 2024, the Department filed a section 300 petition on behalf of A.H. and M.H., alleging the mother inflicted serious physical harm on them, and that the father knew of this physical abuse but failed to protect the children. Both parents denied the allegations.

At the initial hearing, the Department recommended the court detain the children. In response, the father asked the court to release the children to him, arguing the Department did not provide any evidence that he, by himself, was a danger to the children. The father said he lived in Wisconsin and was just visiting during the Department's investigation, and asked the court to allow him to take the children back to Wisconsin. If the court would not allow him to take the children to Wisconsin, the father said he would live with the children in a hotel. The father argued his proposal was a reasonable alternative to removal. The mother joined the father's request.

The children, through counsel, joined the Department's request and opposed the father's. Counsel pointed out the

7

mother had physically assaulted the father, he seemed scared of her, and did not seem able to protect the children.

The court followed the Department's recommendation and ordered the children removed from the parents, but also scheduled a pre-release investigation hearing to assess the possibility of releasing the children to their father.

After the hearing, a Department social worker began the pre-release investigation by interviewing the father. He told the social worker "I've been caring for my kids a lot. I love my kids. I've always been, you know, providing for them even the times that I was not physically with them I was still sending them financial support. Since I got here, I have been cooking for them . . . I think that I can be responsible in taking care of my children."

The social worker asked about the father's living situation, and he provided the address of an apartment in Chatsworth, but also pointed out that his "original home" is in Wisconsin. When the social worker asked if the mother also lived at this address, the father said: "I have no idea. She left this morning. I'm not too sure where she went." At first, the father seemed unsure of whether he was on the lease for the apartment, but then said he was "100% sure" he was on the lease.

The social worker explained that even if the court released the children to him, the father would still be responsible for making sure the mother did not return to their home or have unlimited access to the children. The father said he understood and was "trying to work with you guys and get this the best way possible."

The father then said: "I was dealing with this, with her violence, just to stay with the kids . . . it's just the pressure that

she has [sole custody]." He explained that he stayed silent about the mother's abuse because he had signed the divorce agreement and thought he would never see his children again if he reported the mother. When the social worker asked why the father did not take action sooner, he responded: "There were visitations as I said and we were going through the divorce process. I was doing my best to connect with her regardless of all the trauma."

As for his plans for the children, the father said he would take them to school, but that it was in his best interest to take them to Wisconsin, where his family resides and would help him financially. He was not planning to stay in California. Although he had some health issues when he first came to California that made it hard for him to find a job, he was now working full-time as a rideshare driver.

The next day, the social worker called Gloria A. to speak about the possibility of the children living with the father. Gloria A. expressed concern because of the father's lack of parenting experience, inability to provide financially, and inability to protect the children from their mother. According to Gloria A., the father was not involved with the children for at least two and a half years when the mother moved back to California. Gloria A. also pointed out the father had only been working as a rideshare driver for a week, despite living in California for months, and had fought with the mother about getting half of the children's welfare benefits. She was certain the father was aware of the mother's physical abuse of the children, but he was more focused on protecting the mother instead of the children.

The social worker continued her investigation by speaking with the children's maternal great aunt Eva F., their maternal aunts Kate A. and Emily A., and paternal uncle Basel H.

All three maternal relatives expressed concern about releasing the children to the father. Eva F. said the father was "overwhelmed," "not the most motivated individual," and mostly focused on maximizing his potential settlement from car accident lawsuits. Emily A. reported the father drives fast and recklessly, did not have proper car seats for the children, and left razor blades around and a hookah on the floor. Kate A. shared that there was one instance when the parents gave A.H. "to some random stranger" when the mother had to go to the hospital when they lived in Wisconsin.

Basel H. was the only relative who did not report any concerns about the father having custody over the children: "I would be totally fine if [the father] actually had the kids. [He] is actually more protective." Basel H. also said he saw the mother scream at the children in Wisconsin and that the father told him that the mother physically abused them. When the social worker asked what the father did to protect the children from the mother's abuse, Basel H. said the father contacted his family because he was afraid to go to the police.

Based on its investigation, the Department recommended against releasing the children to the father. In its report, the Department found "the father clearly failed to protect the children by allowing them to be in the mother's care for a prolonged period of time without taking any actions to ensure that the children are safe. The father's intense fear of retribution by the mother is extremely concerning and shows that he had clear knowledge of the mother's abilities to attempt to or successfully cause physical harm, yet has not taken the necessary steps to protect the children." The report also expressed doubt that the father would be able to set boundaries with the mother

10

and keep the mother away from the children, "as evidenced by his prior tendencies and fearfulness of the mother." It noted the father had been "overly vague" about his living situation. The report concluded the children's current placement with Gloria A. was appropriate.

At the next hearing, the father objected to the Department's recommendation, arguing that at the time of the report, the mother had not yet moved out and that she was no longer at the residence. He reiterated that he was not a danger to the children.

The children's attorney responded that the report was "extremely thorough about [the] father's lack of protective capacity with regard to the children."

After hearing from all parties, the court stated: "based upon the report, I agree with the Department, there is a concern about protective capacity in the event the mother has to move in, so at this time the children will remain where they are." The court then scheduled the disposition hearing for the following month.

The Department's December 2024 disposition report recommended sustaining the allegations in the petition, removing the children from physical custody of the parents, and ordering family reunification services for the parents.

Attached to the report was a copy of the August 2024 dissolution judgment of the parents' marriage and settlement agreement. The settlement agreement gave the mother sole legal and sole physical custody of the children and allowed the father to have visitation with the children. According to the agreement, the mother represented herself in the dissolution proceedings and the father had counsel who approved the settlement.

11

At the disposition hearing, the court sustained the allegations against both parents, over the father's objections, and ordered the children removed from the custody of the parents.

III

A juvenile court may not remove a child from a parent's physical custody "unless the juvenile court finds by clear and convincing evidence . . . [that] there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the [child] if the [child] were returned home, and there are no reasonable means by which the [child's] physical health can be protected without removing the [child] from the [child's] parent's . . . physical custody."  (§ 361, subd. (c)(1).)

The parties agree on the appropriate standard of review: whether substantial evidence supports the juvenile court's dispositional finding of clear and convincing evidence that it was reasonable and necessary to remove the children from the father. (See *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012 ["When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable the fact was true"].)  Under this standard, we view the record in the light most favorable to the Department and defer to how the juvenile court evaluated the credibility of witnesses, resolved conflicts in the evidence, and drew reasonable inferences from this evidence.  (See *id.*)

On appeal, the father faults the Department for failing to "adequately explore" the possibility of allowing him to relocate with the children to Wisconsin as an alternative to the "last

resort" of removing them from his custody.  He claims this failure precludes the Department from proving by clear and convincing evidence that there were no reasonable means to protect the children without removing them from his custody.  Additionally, he argues the court could have continued the disposition hearing to allow the Department to assess the suitability of his Wisconsin home for the children.

Two cases form the foundation of the father's argument on appeal:  *In re M.V.* (2022) 78 Cal.App.5th 944 (*M.V.*) and *In re John M.* (2006) 141 Cal.App.4th 1564, 1567 (*John M.*).  Like this case, *M.V.* concerned allegations of a mother who was the "domina[nt] aggressor" and a father who failed to protect.  (See *M.V.*, 78 Cal.App.5th at p. 961.)  In *M.V.*, the appellate court reversed a removal order for lack of substantial evidence when it found the juvenile court did not "adequately consider" the option of ordering the mother to leave the home as an alternative to removal.  (*Id.* at p. 964.)  And in *John M.*, the appellate court found the juvenile court erred in denying a noncustodial father's request for a continuance of the dispositional hearing to allow the agency to assess the suitability of a placement with the father in Tennessee.  (*John M., supra*, 141 Cal.App.4th at p. 1572.)

In response, the Department contends "[t]he record contains ample evidence from which the juvenile court reasonably determined under the heightened clear and convincing standard that [A.H] and [M.H] would be at substantial risk of serious physical harm if they were returned to the father, regardless of whether they lived in California or Wisconsin."  The Department also argues it was not necessary for its reports to address specifically the father's proposed move to Wisconsin, as this

13

Court must presume the juvenile court implicitly considered and rejected this request in its dispositional finding.

The Department is right. The record is clear the juvenile court duly considered whether it was safe to release A.H. and M.H. to the father as an alternative to removal—it ordered the Department to prepare a report and held a hearing on this very issue. Although the Department's report did not explicitly address a potential move to Wisconsin, it did assess the father's ability to protect the children from the mother—the threshold issue that governs, regardless of where the father lives. According to the report, the father said the mother "forced" him to sign paperwork giving her full custody of the children against his wishes. And instead of intervening when the mother was being violent or reporting it to law enforcement, the father recorded videos of her behavior. The report explained that the father's fear of the mother prevented him from standing up to her to protect the children, despite his awareness of her violent tendencies.

The father's failure to recognize the risks to which he exposed M.H. and A.H. alone is substantial evidence supporting the juvenile court's decision to order removal of the children. (See *In re A.F.* (2016) 3 Cal.App.5th 283, 293.) Nothing in the record suggests the father is aware of his role in enabling the mother to harm the children, which makes it unlikely that he can protect them from her in the future, even if he moves out of state. (See *In re V.L.* (2020) 54 Cal.App.5th 147, 156–157.) Viewing this evidence in the light most favorable to the Department, we reject the father's argument that the Department was required to assess the option of allowing the father to take the children to Wisconsin as an alternative to removal. (See *ibid.*)

The father's reliance on *M.V.* is unavailing, for that case is readily distinguishable.  First, in *M.V.*, the violence was between the mother and father, not the mother and children.  (*M.V.*, *supra*, 78 Cal.App.5th at p. 951.)  Second, the father in *M.V.* demonstrated that he could protect his children; he called law enforcement to report violence by the mother and a social worker testified it was safe to place the children with him.  (*Id.* at p. 961.)  Third, in *M.V.*, the social worker admitted the health and human services agency never explored the option of removing the mother from the home, even after the children's counsel requested this option.  (*Id.* at p. 964.)

Turning to the father's *John M.* argument that the court should have continued the hearing to allow further assessment of the proposed relocation to Wisconsin, the father never asked the juvenile court for such a continuance.  As the Department correctly argued, the father forfeited this issue by failing to raise it before the juvenile court.  (*In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1046.)

## DISPOSITION

We affirm the juvenile court's order.


WILEY, J.


We concur:



STRATTON, P. J.                    VIRAMONTES, J.


15